WATT, SECRETARY OF THE INTERIOR, ET AL. *v.*
WESTERN NUCLEAR, INC.

No. 81–1686.   Argued January 17, 1983—Decided June 6, 1983

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and BLACKMUN, JJ., joined. POWELL, J., filed a dissenting opinion, in which REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, *post*, p. 60. STEVENS, J., filed a dissenting opinion, *post*, p. 72.

*John H. Garvey* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Dinkins, Deputy Solicitor General Claiborne*, and *Robert L. Klarquist.*

*Harley W. Shaver* argued the cause for respondent. With him on the brief was *John H. Licht.**

JUSTICE MARSHALL delivered the opinion of the Court.

The Stock-Raising Homestead Act of 1916, the last of the great Homestead Acts, provided for the settlement of homesteads on lands the surface of which was "chiefly valuable for grazing and raising forage crops" and "not susceptible of irrigation from any known source of water supply." 43 U. S. C. § 292. Congress reserved to the United States title to "all the coal and other minerals" in lands patented under the Act. 43 U. S. C. § 299. The question presented by this case is

---

*Briefs of *amici curiae* urging affirmance were filed by *Glenn Parker* and *Steven F. Freudenthal*, Attorney General of Wyoming, for the Wyoming Stock Brokers Association et al.; and by *Thomas E. Meachum* and *Edward Gould Burton* for Eklutna, Inc.

whether gravel found on lands patented under the Act is a mineral reserved to the United States.

## I

## A

The Stock-Raising Homestead Act of 1916 (SRHA), 39 Stat. 862, 43 U. S. C. § 291 *et seq.,* permitted any person qualified to acquire land under the general homestead laws, Act of May 20, 1862, 12 Stat. 392, as amended, 43 U. S. C. § 161 *et seq.,* to make "a stock-raising homestead entry" on "unappropriated, unreserved public lands . . . designated by the Secretary of the Interior as 'stock-raising lands.'"[1] 43 U. S. C. § 291. The Secretary of the Interior was authorized to designate as stockraising lands only

> "lands the surface of which is, in his opinion, chiefly valuable for grazing and raising forage crops, do not contain merchantable timber, are not susceptible of irrigation from any known source of water supply, and are of such character that six hundred and forty acres are reasonably required for the support of a family." 43 U. S. C. § 292.

To obtain a patent, an entryman was required to reside on the land for three years, 43 U. S. C. § 293, incorporating by reference 37 Stat. 123, ch. 153, 43 U. S. C. § 164, and "to make permanent improvements upon the land . . . tending to increase the value of the [land] for stock-raising purposes of the value of not less than $1.25 per acre." 43 U. S. C. § 293.

Section 9 of the Act, the provision at issue in this case, stated that "[a]ll entries made and patents issued . . . shall be

---

[1] The SRHA was effectively suspended by executive action taken pursuant to the Taylor Grazing Act, 48 Stat. 1269, ch. 865, 43 U. S. C. § 315 *et seq.* Both the SRHA and the general homestead laws were repealed by the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, 43 U. S. C. § 1701 *et seq.* Existing patents were unaffected by the repeal.

subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same." 39 Stat. 864, as amended, 43 U. S. C. § 299. Section 9 further provided that "[t]he coal and other mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in force at the time of such disposal."

## B

On February 4, 1926, the United States conveyed a tract of land near Jeffrey City, Wyo., to respondent's predecessor-in-interest. The land was conveyed by Patent No. 974013 issued pursuant to the SRHA. As required by § 9 of the Act, 43 U. S. C. § 299, the patent reserved to the United States "all the coal and other minerals" in the land.

In March 1975 respondent Western Nuclear, Inc., acquired a fee interest in a portion of the land covered by the 1926 patent. Western Nuclear is a mining company that has been involved in the mining and milling of uranium ore in and around Jeffrey City since the early 1950's. In its commercial operations Western Nuclear uses gravel for such purposes as paving and surfacing roads and shoring the shaft of its uranium mine. In view of the expense of having gravel hauled in from other towns, the company decided that it would be economical to obtain a local source of the material, and it acquired the land in question so that it could extract gravel from an open pit on the premises.

After acquiring the land, respondent obtained from the Wyoming Department of Environmental Quality, a state agency, a permit authorizing it to extract gravel from the pit located on the land. Respondent proceeded to remove some 43,000 cubic yards of gravel. It used most of this gravel for paving streets and pouring sidewalks in nearby Jeffrey City, a company town where respondent's mill and mine workers lived.

On November 3, 1975, the Wyoming State Office of the Bureau of Land Management (BLM) served Western Nuclear with a notice that the extraction and removal of the gravel constituted a trespass against the United States in violation of 43 CFR § 9239.0–7 (1975), current version at 43 CFR § 9239.0–7 (1982), a regulation promulgated by the Department of the Interior under the Materials Act of 1947, 61 Stat. 681, as amended by the Surface Resources Act of 1955, 69 Stat. 367, 30 U. S. C. §§ 601–615. The regulation provides that "[t]he extraction, severance, injury, or removal of timber or mineral materials from public lands under the jurisdiction of the Department of the Interior, except when authorized by law and the regulations of the Department, is an act of trespass."

The BLM's appraisal report described the gravel deposit as follows:

> "The deposit located on the property is an alluvial gravel with 6.4 acres of the 14 acre parcel mined for gravel. . . . There are 6–12 inches of overburden on the site . . . . It is estimated that the deposit thickness will average 10 feet or more in thickness." 85 I. D. 129, 131 (1978).

In a technical analysis accompanying the appraisal report, geologist William D. Holsheimer observed that "[t]he gravel is overlain by a soil cover of fairly well developed loamy sand, some 12–18 inches in thickness," and that "[t]here is a relatively good vegetative cover, consisting mainly of sagebrush, and an understory of various native grasses." *Id.*, at 132. The appraisal report concluded that "the highest and best use of the property is for a mineral material (gravel) site." *Id.*, at 131.

After a hearing, the BLM determined that Western Nuclear had committed an unintentional trespass. Using a royalty rate of 30¢ per cubic yard, the BLM ruled that Western Nuclear was liable to the United States for $13,000 in damages for the gravel removed from the site. On appeal to the Interior Board of Land Appeals (IBLA), the IBLA affirmed

the ruling that Western Nuclear had committed a trespass, holding that "gravel in a valuable deposit is a mineral reserved to the United States in patents issued under the Stock-Raising Homestead Act." *Id.*, at 139.[2]

Western Nuclear then filed suit in the United States District Court for the District of Wyoming, seeking review of the Board's decision pursuant to the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.* The District Court affirmed the ruling that the mineral reservation in the SRHA encompasses gravel. *Western Nuclear, Inc.* v. *Andrus*, 475 F. Supp. 654 (1979). Recognizing that "the term 'mineral' does not have a closed, precise meaning," *id.*, at 662, the District Court concluded that the Government's position is supported by the principle that public land grants are to be narrowly construed, *ibid.*, and by "the legislative history, contemporaneous definitions, and court decisions," *id.*, at 663.[3]

---

[2] The IBLA also affirmed the BLM's calculation of damages on the basis of a royalty rate of 30¢ per cubic yard, rejecting Western Nuclear's claim that the use of this rate was arbitrary, capricious, and unreasonable. 85 I. D., at 139. The Board adjusted the damages from the appraiser's rounded-off figure of $13,000 to $12,802.50. *Id.*, at 140.

[3] Following the District Court's ruling, the Wyoming Stock Growers Association (WSGA), which had intervened in the proceedings, filed a motion requesting that the court alter or amend its order or hold a new trial. It expressed the concern that a ruling in favor of the Government in its action against respondent would mean ranchers could not use gravel on lands patented under the SRHA. At a hearing on the WSGA's motions, the Government sought to lay this concern to rest:

"What the United States is concerned about are commercial gravel operations. The United States [does] not see how a commercial gravel operation in any way, shape or form lends itself to helping the rancher. All it does is len[d] itself to helping the mineral company or whoever happens to . . . have a commercial operation. In fact, we would think it would take the land out of the ranch production.

"The United States also has no intention of claiming trespass for [the use of] sand and gravel on [the rancher's] own land for purposes related to ranching. That is not the intent of the United States."

The Government, the WSGA, and two other intervenors entered into a stipulation providing that the District Court's judgment would not bar the

Respondent appealed to the Court of Appeals for the Tenth Circuit. That court reversed, holding that the gravel extracted by Western Nuclear did not constitute a mineral reserved to the United States under the SRHA. *Western Nuclear, Inc.* v. *Andrus*, 664 F. 2d 234 (1981). In reaching this conclusion, the Tenth Circuit relied heavily on a ruling made by the Secretary of the Interior prior to the enactment of the SRHA that land containing valuable deposits of gravel did not constitute "mineral land" beyond the reach of the homestead laws. *Id.*, at 240. The court also relied on an analogy to "ordinary rocks and stones," *id.*, at 242, which it said cannot be reserved minerals, lest patentees be left with "only the dirt, and little or nothing more." *Ibid.* The court reasoned that "if ordinary rocks are not reserved minerals, it follows that gravel, a form of fragmented rock, also is not a reserved mineral." *Ibid.*

In view of the importance of the case to the administration of the more than 33 million acres of land patented under the SRHA,[4] we granted certiorari. 456 U. S. 988 (1982). We now reverse.

## II

As this Court observed in a case decided before the SRHA was enacted, the word "minerals" is "used in so many senses, dependent upon the context, that the ordinary definitions of

---

intervenors "from raising, in the future, issues of fact and law concerning their property rights in sand and gravel." App. to Pet. for Cert. 44a. The stipulation was approved by the District Court and incorporated in its judgment.

[4] See Dept. of Interior, Report of Director of Bureau of Land Management, 1948, Statistical Appendix, Table 17, p. 22.

Whether gravel is a mineral for purposes of the SRHA is an issue of first impression in the federal courts. In a state condemnation proceeding the New Mexico Supreme Court held, with little explanation, that gravel does not constitute a mineral reserved to the United States under the Act. *State ex rel. Highway Comm'n* v. *Trujillo*, 82 N. M. 694, 487 P. 2d 122 (1971).

the dictionary throw but little light upon its signification in a given case." *Northern Pacific R. Co.* v. *Soderberg*, 188 U. S. 526, 530 (1903). In the broad sense of the word, there is no doubt that gravel is a mineral, for it is plainly not animal or vegetable. But "the scientific division of all matter into the animal, vegetable or mineral kingdom would be absurd as applied to a grant of lands, since all lands belong to the mineral kingdom." *Ibid.* While it may be necessary that a substance be inorganic to qualify as a mineral under the SRHA, it cannot be sufficient. If all lands were considered "minerals" under the SRHA, the owner of the surface estate would be left with nothing.

Although the word "minerals" in the SRHA therefore cannot be understood to include all inorganic substances, gravel would also be included under certain narrower definitions of the word. For example, if the term "minerals" were understood in "its ordinary and common meaning [as] a comprehensive term including every description of stone and rock deposit, whether containing metallic or non-metallic substances," *Waugh* v. *Thompson Land & Coal Co.*, 103 W. Va. 567, 571, 137 S. E. 895, 897 (1927); see, *e. g.*, *Board of County Comm'rs* v. *Good*, 44 N. M. 495, 498, 105 P. 2d 470, 472 (1940); *White* v. *Miller*, 200 N. Y. 29, 38–39, 92 N. E. 1065, 1068 (1910), gravel would be included. If, however, the word "minerals" were understood to include only inorganic substances having a definite chemical composition, see, *e. g.*, *Ozark Chemical Co.* v. *Jones*, 125 F. 2d 1, 2 (CA10 1941), cert. denied, 316 U. S. 695 (1942); *Lillington Stone Co.* v. *Maxwell*, 203 N. C. 151, 152, 165 S. E. 351, 352 (1932); *United States* v. *Aitken*, 25 Philippine 7, 14 (1913), gravel would not be included.

The various definitions of the term "minerals" serve only to exclude substances that are not minerals under any common definition of that word. Cf. *United States* v. *Toole*, 224 F. Supp. 440 (Mont. 1963) (deposits of peat and peat moss, substances which are high in organic content, do not constitute

mineral deposits for purposes of the general mining laws). For a substance to be a mineral reserved under the SRHA, it must be not only a mineral within one or more familiar definitions of that term, as is gravel, but also the type of mineral that Congress intended to reserve to the United States in lands patented under the SRHA. Cf. *Andrus* v. *Charlestone Stone Products Co.*, 436 U. S. 604, 611 (1978).[5]

The legal understanding of the term "minerals" prevailing in 1916 does not indicate whether Congress intended the mineral reservation in the SRHA to encompass gravel. On the one hand, in *Northern Pacific R. Co.* v. *Soderberg, supra,* this Court had quoted with approval a statement in an English case that "'everything except the mere surface, which is used for agricultural purposes; anything beyond that which is useful for any purpose whatever, whether it is *gravel,* marble, fire clay, or the like, comes within the word "mineral" when there is a reservation of the mines and minerals from a grant of land.'" 188 U. S., at 536 (emphasis added), quoting *Midland R. Co.* v. *Checkley*, L. R. 4 Eq. 19, 25 (1867).

---

[5] The specific listing of coal in the reservation clause of the SRHA sheds no light on what Congress meant by the term "minerals." See *Skeen* v. *Lynch*, 48 F. 2d 1044, 1046–1047 (CA10), cert. denied, 284 U. S. 633 (1931). There were special reasons for expressly addressing coal that negate any inference that the phrase "and other minerals" was meant to reserve only substances *ejusdem generis.* The legal context in which the SRHA was enacted suggests that Congress specifically listed coal to make clear that coal was reserved even though existing law treated it differently from other minerals. Coal had been exempted from the application of the general mining laws. See Coal Lands Act of 1873, 17 Stat. 607, current version at 30 U. S. C. § 71 *et seq.* In addition, the Coal Lands Acts of 1909 and 1910 permitted the acquisition of lands containing coal under patents reserving the coal to the United States. 35 Stat. 844, current version at 30 U. S. C. § 81; 36 Stat. 583, ch. 318, current version at 30 U. S. C. § 83 *et seq.* See also Act of Apr. 30, 1912, 37 Stat. 105, ch. 99, 30 U. S. C. § 90. That the express listing of coal was not intended to limit the phrase "other minerals" is confirmed by the alternate use of the phrases "coal and other minerals" and "all minerals" in the House Report on the bill that became the SRHA. See H. R. Rep. No. 35, 64th Cong., 1st Sess., 18 (1916).

*Soderberg* concerned the proper classification of property chiefly valuable for granite quarries under an 1864 statute which granted certain property to railroads but exempted "mineral lands." The Court held that the property fell within the exemption, concluding that "mineral lands include not merely metalliferous lands, but all such as are chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture." 188 U. S., at 536–537.[6]

On the other hand, in 1910 the Secretary of the Interior rejected an attempt to cancel a homestead entry made on land alleged to be chiefly valuable for the gravel and sand located thereon. *Zimmerman* v. *Brunson*, 39 L. D. 310, overruled, *Layman* v. *Ellis*, 52 L. D. 714 (1929). Zimmerman claimed that gravel and sand found on the property could be used for building purposes and that the property therefore constituted mineral land, not homestead land. In refusing to cancel Brunson's homestead entry, the Secretary explained that "deposits of sand and gravel occur with considerable frequency in the public domain." 39 L. D., at 312. He concluded that land containing deposits of gravel and sand useful for building purposes was not mineral land beyond the reach of the homestead laws, except in cases in which the deposits "possess a peculiar property or characteristic giving them a special value." *Ibid.*

Respondent errs in relying on *Zimmerman* as evidence that Congress could not have intended the term "minerals" to encompass gravel. Although the legal understanding of a

---

[6] Relying on *Soderberg*, the Supreme Court of Oregon subsequently held that "land more valuable for the building sand it contains than for agriculture . . . is mineral within the meaning of the United States mining statutes." *Loney* v. *Scott*, 57 Ore. 378, 385, 112 P. 172, 175 (1910). See also *State ex rel. Atkinson* v. *Evans*, 46 Wash. 219, 223–224, 89 P. 565, 567–568 (1907) (relying on *Soderberg* in holding that land containing valuable deposits of limestone, silica, silicated rock, and clay constituted mineral land under a state statute).

word prevailing at the time it is included in a statute is a relevant factor to consider in determining the meaning that the legislature ascribed to the word, we do not see how any inference can be drawn that the 64th Congress understood the term "minerals" to exclude gravel. It is most unlikely that many Members of Congress were aware of the ruling in *Zimmerman*, which was never tested in the courts and was not mentioned in the Reports or debates on the SRHA. Cf. *Helvering* v. *New York Trust Co.*, 292 U. S. 455, 468 (1934). Even if Congress had been aware of *Zimmerman*, there would be no reason to conclude that it approved of the Secretary's ruling in that case rather than this Court's opinion in *Soderberg*, which adopted a broad definition of the term "mineral" and quoted with approval a statement that gravel is a mineral.[7]

### III

Although neither the dictionary nor the legal understanding of the term "minerals" that prevailed in 1916 sheds much

---

[7] Quite apart from *Soderberg*, even if Congress had been aware of *Zimmerman*, there would be little basis for inferring that it intended to follow the specific ruling in that case rather than the Interior Department's general approach in classifying land as mineral land or nonmineral land. As a leading contemporary treatise pointed out, 2 C. Lindley, American Law Relating to Mining and Mineral Lands § 424, p. 996, and n. 78 (3d ed. 1914), *Zimmerman* was inconsistent with the Department's traditional treatment of the problem. Whereas the Secretary emphasized in *Zimmerman* that gravel is a common substance, other Department rulings recognized that land containing deposits of other common substances constituted "mineral land" if the deposits were found "in quantity and quality sufficient to render the land more valuable on account thereof than for agricultural purposes." *Pacific Coast Marble Co.* v. *Northern Pacific R. Co.*, 25 L. D. 233, 245 (1897). See *Bennett* v. *Moll*, 41 L. D. 584 (1912) (pumice); *McGlenn* v. *Wienbroeer*, 15 L. D. 370 (1892) (building stone); *H. P. Bennett, Jr.*, 3 L. D. 116 (1884) (building stone); *W. H. Hooper*, 1 L. D. 560 (1881) (gypsum).

In 1913 the Interior Department itself listed gravel as a mineral in a comprehensive study of the public lands. Dept. of Interior, United States Geological Survey, Bulletin 537, The Classification of the Public Lands 138–139 (1913).

light on the question before us, the purposes of the SRHA strongly support the Government's contention that the mineral reservation in the Act includes gravel.   As explained below, Congress' underlying purpose in severing the surface estate from the mineral estate was to facilitate the concurrent development of both surface and subsurface resources. While Congress expected that homesteaders would use the surface of SRHA lands for stockraising and raising crops, it sought to ensure that valuable subsurface resources would remain subject to disposition by the United States, under the general mining laws or otherwise, to persons interested in exploiting them.   It did not wish to entrust the development of subsurface resources to ranchers and farmers.   Since Congress could not have expected that stockraising and raising crops would entail the extraction of gravel deposits from the land, the congressional purpose of facilitating the concurrent development of both surface and subsurface resources is best served by construing the mineral reservation to encompass gravel.

## A

The SRHA was the most important of several federal land-grant statutes enacted in the early 1900's that reserved minerals to the United States rather than classifying lands as mineral or nonmineral.   Under the old system of land classification, the disposition of land owned by the United States depended upon whether it was classified as mineral land or nonmineral land, and title to the entire land was disposed of on the basis of the classification.   This system of land classification encouraged particular uses of entire tracts of land depending upon their classification as mineral or nonmineral. With respect to land deemed mineral in character, the mining laws provided incentives for the discovery and exploitation of minerals, but the land could not be disposed of under the major land-grant statutes.[8]   With respect to land deemed

---

[8] For example, mineral land was exempted from the homestead laws, Act of June 21, 1866, § 1, 14 Stat. 66, ch. 127, 43 U. S. C. § 201, from stat-

48

nonmineral in character, the land-grant statutes provided incentives for parties who wished to use the land for the purposes specified in those statutes, but the land was beyond the reach of the mining laws and the incentives for exploration and development that they provided.

For a number of reasons,[9] the system of land classification came to be viewed as a poor means of ensuring the optimal development of the Nation's mineral resources, and after the turn of the century a movement arose to replace it with a system of mineral reservation. In 1906 President Theodore Roosevelt withdrew approximately 64 million acres of lands

---

utes granting lands to railroads, Act of July 1, 1862, § 3, 12 Stat. 492; Act of July 2, 1864, § 3, 13 Stat. 367, and from a statute granting land to States for agricultural colleges, Act of July 2, 1862, § 1, ch. 130, 12 Stat. 503. See generally *United States* v. *Sweet*, 245 U. S. 563, 567–572 (1918); *Deffeback* v. *Hawke*, 115 U. S. 392, 400–401 (1885). If land was classified as mineral land, it could not be conveyed under these statutes.

[9] Land was frequently misclassified as nonmineral. Misclassification resulted both from fraud and from the practical difficulties in telling at the time of classification whether land was more valuable for the minerals it contained than for agricultural purposes. See *Deffeback* v. *Hawke, supra*, at 405. Classification depended largely upon affidavits of entrymen, reports by surveyors, information available from field offices of the Land Department, and information provided by persons with an interest in contesting the classification of particular land as nonmineral. Frequent errors were inevitable. See 1 American Law of Mining § 3.1 (1982); *West* v. *Edward Rutledge Timber Co.*, 244 U. S. 90, 98 (1917). If land was erroneously classified as nonmineral and conveyed under a land-grant statute, the patentee received title to the entire land, including any subsequently discovered minerals. See *Diamond Coal & Coke Co.* v. *United States*, 233 U. S. 236, 239–240 (1914); *Shaw* v. *Kellogg*, 170 U. S. 312, 342–343 (1898). Absent proof of fraud, see *Diamond Coal & Coke Co.* v. *United States, supra*, at 239–240, the Government had no recourse once title passed.

Even with respect to land properly classified as more valuable for agricultural or other purposes than for the minerals it contained, the system of land classification provided incentives only for the use of surface resources. After land was classified as nonmineral and conveyed under a land-grant statute, only the grantee had an incentive to discover and exploit minerals lying beneath the land. If he did not do so, they would remain undeveloped.

thought to contain coal from all forms of entry, citing the prevalence of land fraud and the need to dispose of coal "under conditions which would inure to the benefit of the public as a whole." 41 Cong. Rec. 2615 (1907). Secretary of the Interior Garfield reported to the President that "the best possible method . . . is for the Government to retain the title to the coal," explaining that "[s]uch a method permits the separation of the surface from the coal and the unhampered use of the surface for purposes to which it may be adapted." Report of the Secretary of the Interior 15 (1907), H. R. Doc. No. 5, 60th Cong., 1st Sess., 15 (1907). President Roosevelt subsequently urged Congress that "[r]ights to the surface of the public land . . . be separated from rights to forests upon it and to minerals beneath it, and these should be subject to separate disposal." Special Message to Congress, Jan. 22, 1909, 15 Messages and Papers of the Presidents 7266.

Over the next several years Congress responded by enacting statutes that reserved specifically identified minerals to the United States,[10] and in 1916 the shift from land classification to mineral reservation culminated with the enactment of the SRHA. Unlike the preceding statutes containing mineral reservations, the SRHA was not limited to lands classified as mineral in character, and it did not reserve only specifically identified minerals. The SRHA applied to all lands

_____

[10] The Coal Lands Act of 1909 permitted settlers on lands which President Roosevelt had subsequently withdrawn from entry under the homestead laws to obtain patents which reserved the coal to the United States. 35 Stat. 844, current version at 30 U. S. C. § 81. The Coal Lands Act of 1910 made withdrawn lands available for settlement and permitted settlers to obtain patents which reserved the coal to the United States. 36 Stat. 583, ch. 318, current version at 30 U. S. C. § 83 *et seq.* See also Act of Apr. 30, 1912, 37 Stat. 105, ch. 99, 30 U. S. C. § 90. The Agricultural Entry Act of 1914 permitted the acquisition of lands withdrawn from entry, or classified as valuable, because of the phosphate, nitrate, potash, oil, gas, or asphaltic minerals they contained, but provided that patents would reserve to the United States all such minerals. 38 Stat. 509, as amended, 30 U. S. C. § 121 *et seq.*

the surface of which the Secretary of the Interior deemed to be "chiefly valuable for grazing and raising forage crops," 43 U. S. C. § 292, and reserved all the minerals in those lands to the United States.

Congress' purpose in severing the surface estate from the mineral estate was to encourage the concurrent development of both the surface and subsurface of SRHA lands. The Act was designed to supply "a method for the *joint use* of the surface of the land by the entryman of the surface thereof and the person who shall acquire from the United States the right to prospect, enter, extract and remove all minerals that may underlie such lands." H. R. Rep. No. 35, 64th Cong., 1st Sess., 4, 18 (1916) (emphasis added) (hereafter H. R. Rep. No. 35). The Department of the Interior had advised Congress that the law would "induce the entry of lands in those mountainous regions where deposits of mineral are known to exist or are likely to be found," and that the mineral reservation was necessary because the issuance of "unconditional patents for these comparatively large entries under the homestead laws might withdraw immense areas from prospecting and mineral development." Letter from First Assistant Secretary of the Interior to Chairman of the House Committee on the Public Lands, Dec. 15, 1915, reprinted in H. R. Rep. No. 35, at 5.

To preserve incentives for the discovery and exploitation of minerals in SRHA lands, Congress reserved "all the coal and other minerals" to the United States and provided that "coal and other mineral deposits . . . shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in force at the time of such disposal." 43 U. S. C. § 299. The general mining laws were the most important of the "mineral land laws" in existence when the SRHA was enacted. Act of July 4, 1866, 14 Stat. 85; Act of May 10, 1872, 17 Stat. 91, current version at 30 U. S. C. § 21 *et seq.* Those laws, which have remained basically unchanged through the present day, provide an incen-

tive for individuals to locate claims to federal land containing "valuable mineral deposits." 30 U. S. C. § 22. After a claim has been located, the entryman obtains from the United States the right to exclusive possession of "all the surface included within the lines of [his] locatio[n]" and the right to extract minerals lying beneath the surface. 30 U. S. C. § 26. Congress plainly contemplated that mineral deposits on SRHA lands would be subject to location under the mining laws,[11] and the Department of the Interior has consistently permitted prospectors to make entries under the mining laws on SRHA lands.[12]

---

[11] This is evident from the provisions in the Act prescribing standards to govern the joint use of SRHA lands by owners of surface estates and prospectors and miners. Section 9 of the SRHA extended to "[a]ny person qualified to locate and enter the coal and other mineral deposits, or having the right to mine and remove the same under the laws of the United States, . . . the right at all times to enter upon the lands entered or patented [under the SRHA] for the purpose of prospecting for coal or other mineral therein." To protect the homesteader, Congress made it a condition of the prospector's entry on the land that he "not injure, damage, or destroy the [homesteader's] permanent improvements," and also provided that the prospector "shall be liable . . . for all damages to the crops on such lands by reason of such prospecting." Any person who, after discovering minerals, acquires from the United States "the right to mine and remove the same" can "reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal," if he (1) obtains the written consent or waiver of the homesteader, (2) compensates the homesteader for any damages to the "crops or other tangible improvements" on the land, or (3) executes a bond to secure the payment of such damages. In 1949 Congress increased the patentee's protection by expanding the liability of the prospector or miner to encompass "any damage that may be caused to the value of the land for grazing." 63 Stat. 215, § 5, 30 U. S. C. § 54.

[12] See Department of the Interior, Circular No. 1278, *Mining Claims on the Public Domain*, 55 I. D. 235, 236 (1935); 43 CFR § 185.1 (1939), current version at 43 CFR § 3811.1 (1982). By their own terms, the mining laws apply to "all valuable mineral deposits in lands belonging to the United States." 30 U. S. C. § 22. Like other interests in land owned by the Government (*e. g.*, leaseholds, easements), mineral estates reserved under

## B

Since Congress intended to facilitate development of both surface and subsurface resources, the determination of whether a particular substance is included in the surface estate or the mineral estate should be made in light of the use of the surface estate that Congress contemplated. As the Court of Appeals for the Ninth Circuit noted in *United States v. Union Oil Co. of California*, 549 F. 2d 1271, 1274, cert. denied, 434 U. S. 930 (1977), "[t]he agricultural purpose indicates the nature of the grant Congress intended to provide homesteaders via the Act."[13] See *Pacific Power & Light Co.*, 45 I. B. L. A. 127, 134 (1980) ("When there is a dispute as to whether a particular mineral resource is included in the [SRHA] reservation, it is helpful to consider the manner in which the material is extracted and used"); 1 American Law of Mining § 3.26 (1982) ("The reservation of minerals to the United States [in the SRHA] should . . . be construed by considering the purposes both of the grant and of the reservation in terms of the use intended"). Cf. *United States v. Isbell Construction Co.*, 78 I. D. 385, 390 (1971) (holding that gravel is a mineral reserved to the United States under statute authorizing the grant to States of "grazing district land") ("The reservation of minerals to the United States should be construed by considering the purpose of the grant . . . in terms of the use intended").

---

the SRHA constitute "lands belonging to the United States." Cf. *Devearl W. Dimond*, 62 I. D. 260, 262 (1955) (minerals reserved under the SRHA constitute "vacant, unreserved, and undisposed of public lands" under statute adding lands to the Navajo Indian Reservation in Utah). See also Act of Sept. 19, 1964, 78 Stat. 985, § 10, 43 U. S. C. § 1400 (1970 ed.) (for purposes of statute creating Public Land Law Review Commission, "the term 'public lands' includes . . . outstanding interests of the United States in lands patented, conveyed in fee or otherwise, under the public land laws").

[13] In *Union Oil* the Ninth Circuit held that geothermal steam constitutes a mineral reserved to the United States under the SRHA.

Congress plainly expected that the surface of SRHA lands would be used for stockraising and raising crops. This understanding is evident from the title of the Act, from the express provision limiting the Act to lands the surface of which was found by the Secretary of the Interior to be "chiefly valuable for grazing and raising forage crops" and "of such a character that six hundred and forty acres are reasonably required for the support of a family," 43 U. S. C. § 292, and from numerous other provisions in the Act. See, e. g., 43 U. S. C. § 293 (patent can be acquired only if the entryman makes "permanent improvements upon the land entered . . . tending to increase the value of the [land] for stock-raising purposes of the value of not less than $1.25 per acre"); 43 U. S. C. § 299 (prospector liable to entryman or patentee for damages to crops caused by prospecting).

Given Congress' understanding that the surface of SRHA lands would be used for ranching and farming, we interpret the mineral reservation in the Act to include substances that are mineral in character (i. e., that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate. See 1 American Law of Mining, supra, § 3.26 ("A reservation of minerals should be considered to sever from the surface all mineral substances which can be taken from the soil and which have a separate value"). Cf. Northern Pacific R. Co. v. Soderberg, 188 U. S., at 536–537 ("mineral lands include not merely metalliferous lands, but all such as are chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture"); United States v. Isbell Construction Co., supra, at 390 ("the reservation of minerals should be considered to sever from the surface all mineral substances which can be taken from the soil and have a separate value") (emphasis in original). This interpretation of the mineral reservation best serves the congressional purpose of encouraging the concurrent development of both

surface and subsurface resources, for ranching and farming do not ordinarily entail the extraction of mineral substances that can be taken from the soil and that have separate value.[14]

---

[14] It is important to remember that, in contrast to the situation in *Zimmerman* v. *Brunson*, 39 L. D. 310 (1910), where treating gravel as a mineral would have required cancellation of a homestead entry, treating a substance as a mineral under the SRHA in no way calls into question any homestead entries, for the SRHA was not limited to nonmineral land. The only consequence is that title to the substance rests with the United States rather than with the owner of the surface estate, and that if the latter wishes to extract the substance and sell it or use it for commercial purposes, he must first acquire the right to do so from the United States.

We note that this case does not raise the question whether the owner of the surface estate may use a reserved mineral to the extent necessary to carry out ranching and farming activities successfully. Although a literal reading of the SRHA would suggest that any use of a reserved mineral is a trespass against the United States, one of the overriding purposes of the Act was to permit settlers to establish and maintain successful homesteads. There is force to the argument that this purpose would be defeated if the owner of the surface estate were unable to use reserved minerals even where such use was essential for stockraising and raising crops.

An analogy may profitably be drawn to *Shiver* v. *United States*, 159 U. S. 491 (1895), in which this Court recognized that an entryman under the homestead laws had a right to cut timber to the extent necessary to establish a homestead, notwithstanding a federal statute making it a crime to cut timber upon "lands of the United States." A literal interpretation of the two statutes would have led to the conclusion that the entryman had no right to cut timber prior to the perfection of his entry, for the land, including the timber, remained the property of the United States during that period, and the statute concerning timber contained no exception for lands entered under the homestead laws. *Id.*, at 497. The Court rejected this mechanical approach to the problem, emphasizing that "the privilege of residing on the land for five years [the period then necessary to perfect a homestead entry and thus obtain a patent] would be ineffectual if [the homesteader] had not also the right to build himself a house, outbuildings, and fences, and to clear the land for cultivation," and concluding that "to that extent the [homestead] act limits and modifies" the statute making it a crime to cut timber on public lands. *Ibid.* Cf. *United States* v. *Cook*, 19 Wall. 591, 593 (1874) (although treaty gave Indians only the right to use and occupy certain land, and although "timber while standing is part of the realty, and . . . can only be sold as the land could be," the Indians' right of

Whatever the precise scope of the mineral reservation may be, we are convinced that it includes gravel. Like other minerals, gravel is inorganic. Moreover, as the Department of the Interior explained in 1929 when it overruled *Zimmerman* v. *Brunson*, 39 L. D. 310 (1910), and held that gravel deposits were subject to location under the mining laws,

> "[w]hile the distinguishing special characteristics of gravel are purely physical, notably, small bulk, rounded surfaces, hardness, these characteristics render gravel readily distinguishable by any one from other rock and fragments of rock and are the very characteristics or properties that long have been recognized as imparting to it utility and value in its natural state." *Layman* v. *Ellis*, 52 L. D., at 720.

Insofar as the purposes of the SRHA are concerned, it is irrelevant that gravel is not metalliferous and does not have a definite chemical composition. What is significant is that gravel can be taken from the soil and used for commercial purposes.

Congress certainly could not have expected that homesteaders whose "experience and efforts [were] in the line of stock raising and farming," Letter from First Assistant Secretary of the Interior to Chairman of the House Committee on the Public Lands (Dec. 15, 1915), reprinted in H. R. Rep. No. 35, at 5, would have the interest in extracting deposits of

use and occupancy encompassed the right to cut timber "for use upon the premises" or "for the improvement of the land"); *Alabama Coal Lands— Act of Apr. 23, 1912*, 41 L. D. 32, 33 (1912) ("There is at this time no law which provides for the disposition of the coal in these lands. Persons having homestead entries . . . obtain no right to obtain coal therefrom, *except for their own domestic use* . . .") (emphasis added).

In this case, however, respondent cannot rely on any right it may have to use reserved minerals to the extent necessary for ranching and farming purposes, since it plainly did not use the gravel it extracted for any such purpose. The gravel was used for commercial operations that were in no way connected with any ranching or farming activity.

gravel from SRHA lands that others might have. It had been informed that "[t]he farmer-stockman is not seeking and does not desire the minerals," *ibid.*, and it would have had no more reason to think that he would be interested in extracting gravel than that he would be interested in extracting coal. Stockraising and raising crops do not ordinarily involve the extraction of gravel from a gravel pit.

If we were to interpret the SRHA to convey gravel deposits to the farmers and stockmen who made entries under the Act, we would in effect be saying that Congress intended to make the exploitation of such deposits dependent solely upon the initiative of persons whose interests were known to lie elsewhere. In resolving the ambiguity in the language of the SRHA, we decline to construe that language so as to produce a result at odds with the purposes underlying the statute. Instead, we interpret the language of the statute in a way that will further Congress' overriding objective of facilitating the concurrent development of surface and subsurface resources. See, *e. g.*, *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 285 (1956); *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344, 350–351 (1943); *Griffiths* v. *Commissioner*, 308 U. S. 355, 358 (1939).

## IV

Our conclusion that gravel is a mineral for purposes of the SRHA is supported by the treatment of gravel under other federal statutes concerning minerals. Although the question has not often arisen, gravel has been treated as a mineral under two federal land-grant statutes that, like the SRHA, reserve all minerals to the United States. In construing a statute which allotted certain Indian lands but reserved the minerals therein to the Indians, the Department of the Interior has ruled that gravel is a mineral. Dept. of Interior, Division of Public Lands, Solicitor's Opinion, M–36379 (Oct. 3, 1956). Similarly, the Interior Board of Land Appeals has held that gravel is reserved to the United States under a

statute authorizing grants to States of "grazing district land." *United States* v. *Isbell Construction Co.*, 78 I. D., at 394–396.

It is also highly pertinent that federal administrative and judicial decisions over the past half-century have consistently recognized that gravel deposits could be located under the general mining laws until common varieties of gravel were prospectively removed from the purview of those laws by the Surface Resources Act of 1955, 69 Stat. 368, § 3, 30 U. S. C. § 611.[15]  See *Edwards* v. *Kleppe*, 588 F. 2d 671, 673 (CA9 1978); *Charlestone Stone Products Co.* v. *Andrus*, 553 F. 2d 1209, 1214–1215 (CA9 1977), holding as to a separate mining claim rev'd,[16] 436 U. S. 604 (1978); *Melluzzo* v. *Morton*, 534

---

[15] That Act provides that "[n]o deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws." Claims located prior to the effective date of the Act were not affected by its enactment. With respect to deposits of the substances listed in the Act that were not located prior to the effective date of the Act and that are owned by the United States, disposal is permissible only under the Materials Act of 1947, 61 Stat. 681, § 1, as amended, 30 U. S. C. § 601, which provides in pertinent part that "[t]he Secretary [of the Interior], under such rules and regulations as he may prescribe, may dispose of mineral materials (including but not limited to common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders, and clay) . . . ."

The Surface Resources Act is by its terms limited to the locatability of claims under the mining laws and does not limit the scope of the mineral reservation in the SRHA. See Dept. of Interior, Division of Public Lands, Solicitor's Opinion, M–36417 (Feb. 15, 1957).

[16] *Charlestone Stone Products Co.* involved several different mining claims. In the part of its decision that is pertinent for present purposes, the Ninth Circuit upheld the validity of claims to commercially exploitable deposits of sand and gravel. The Secretary of the Interior did not seek certiorari with respect to this portion of the Ninth Circuit's decision, limiting his petition for certiorari to that part of the Ninth Circuit's decision which upheld the validity of a claim to subsurface water. See 436 U. S., at 610 ("The single question presented in the petition is '[w]hether water is a locatable mineral under the mining law of 1872'").

F. 2d 860, 862–865 (CA9 1976); *Clear Gravel Enterprises, Inc.* v. *Keil*, 505 F. 2d 180, 181 (CA9 1974) *(per curiam); Verrue* v. *United States*, 457 F. 2d 1202, 1203–1204 (CA9 1972); *Barrows* v. *Hickel*, 447 F. 2d 80, 82–83 (CA9 1971); *United States* v. *Schaub*, 163 F. Supp. 875, 877–878 (Alaska 1958); *Taking of Sand and Gravel from Public Lands for Federal Aid Highways*, 54 I. D. 294, 295–296 (1933); *Layman* v. *Ellis*, 52 L. D., at 718–721, overruling *Zimmerman* v. *Brunson*, 39 L. D. 310 (1910).[17] Cf. *United States* v. *Barngrover*, 57 I. D. 533 (1942) (clay and silt deposits); *Stephen E. Day, Jr.*, 50 L. D. 489 (1924) (trap rock). While this Court has never had occasion to decide the appropriate treatment of gravel under the mining laws, the Court did note in *United States* v. *Coleman*, 390 U. S. 599, 604 (1968), that gravel deposits had "served as a basis for claims to land patents" under the mining laws prior to the enactment of the Surface Resources Act of 1955.[18]

---

[17] The only decision to the contrary, *Anchorage Sand & Gravel Co.* v. *Schubert*, 114 F. Supp. 436, 438 (Alaska 1953), aff'd on other grounds, 224 F. 2d 623 (CA9 1955), was never followed in either the District in which it was decided or elsewhere in the Ninth Circuit.

[18] The treatment of valuable deposits of gravel as mineral deposits locatable under the mining laws reflects an application of the "prudent-man test" which the Secretary of the Interior has used to interpret the mining laws since 1894. Under this test, which has been repeatedly approved by this Court, *United States* v. *Coleman*, 390 U. S., at 602; *Best* v. *Humboldt Placer Mining Co.*, 371 U. S. 334, 335–336 (1963); *Cameron* v. *United States*, 252 U. S. 450, 459 (1920); *Chrisman* v. *Miller*, 197 U. S. 313, 322 (1905), a deposit is locatable if it is "of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *Castle* v. *Womble*, 19 L. D. 455, 457 (1894). In the case of "precious metals which are in small supply and for which there is a great demand," there is ordinarily "little room for doubt that they can be extracted and marketed at a profit." *United States* v. *Coleman, supra*, at 603. In the case of nonmetalliferous substances such as gravel, the Secretary has required proof that "by reason of accessibility, *bona fides* in development,

The treatment of gravel as a mineral under the general mining laws suggests that gravel should be similarly treated under the SRHA, for Congress clearly contemplated that mineral deposits in SRHA lands would be subject to location under the mining laws, and the applicable regulations have consistently permitted such location. *Supra*, at 51. Simply as a matter of consistent interpretation of statutes concerning the same subject matter, if gravel deposits constituted "mineral deposits" that could be located under the mining laws, then presumptively gravel should constitute a "mineral" reserved to the United States under the SRHA. If gravel were deemed to be part of the surface estate of lands patented under the SRHA, gravel deposits on SRHA lands obviously would not have been locatable, whereas gravel deposits on other lands would have been locatable. There is no indication that Congress intended the mineral reservation in the SRHA to be narrower in scope than the mining laws.

## V

Finally, the conclusion that gravel is a mineral reserved to the United States in lands patented under the SRHA is buttressed by "the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *United States* v. *Union Pacific R. Co.*, 353 U. S. 112, 116 (1957). See *Andrus* v. *Charlestone Stone Products Co.*, 436 U. S., at 617; *Caldwell* v. *United States*, 250 U. S. 14, 20–21 (1919); *Northern Pacific R. Co.* v. *Soderberg*, 188 U. S., at 534. In the present case this principle applies with particu-

proximity to market, existence of present demand, and other factors, the deposit is of such value that it can be mined, removed and disposed of at a profit." *Taking of Sand and Gravel from Public Lands for Federal Aid Highways*, 54 I. D. 294, 296 (1933). See *Foster* v. *Seaton*, 106 U. S. App. D. C. 253, 255, 271 F. 2d 836, 838 (1959).

lar force, because the legislative history of the SRHA reveals Congress' understanding that the mineral reservation would "limit the operation of this bill *strictly to the surface of the lands*." H. R. Rep. No. 35, at 18 (emphasis added). See also 53 Cong. Rec. 1171 (1916) (the mineral reservation "would cover every kind of mineral"; "[a]ll kinds of minerals are reserved") (Rep. Ferris). In view of the purposes of the SRHA and the treatment of gravel under other federal statutes concerning minerals, we would have to turn the principle of construction in favor of the sovereign on its head to conclude that gravel is not a mineral within the meaning of the Act.

## VI

For the foregoing reasons, we hold that gravel is a mineral reserved to the United States in lands patented under the SRHA. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE POWELL, with whom JUSTICE REHNQUIST, JUSTICE STEVENS, and JUSTICE O'CONNOR join, dissenting.

The Court's opinion may have a far-reaching effect on patentees of, and particularly successors in title to, the 33 million acres of land patented under the Stock-Raising Homestead Act of 1916 (SRHA). The Act provides, with respect to land patented, that the United States reserves title to "all the coal and other minerals." 43 U. S. C. § 299. At issue here is whether gravel is a mineral within the meaning of the Act. To decide this question, the Court adopts a new definition of the statutory term: "[T]he Act [includes] substances that are mineral in character (*i. e.*, that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate." *Ante*, at 53.

This definition compounds, rather than clarifies, the ambiguity inherent in the term "minerals."[1]   It raises more questions than it answers.   Under the Court's definition, it is arguable that all gravel falls within the mineral reservation. *Ante*, at 53–55, and n. 14, 59.   This goes beyond the Government's position that gravel *deposits* become reserved only when susceptible to commercial exploitation.   See Tr. of Oral Arg. 18–20.[2]   And what about sand, clay, and peat?[3]

[1] To interpret the mineral reservation "to include substances that are mineral in character . . . and that there is no reason to suppose were intended to be included in the surface estate" is tautological, and to include *all* substances "that can be used for commercial purposes" is to ignore the prerequisites to commercial value of quantity and quality.   The only factor that can be said to provide any guidance is that the substance must be one "that can be removed from the soil."   Moreover, the Department of the Interior has operated under a common definition of the statutory term "mineral" in the general mining laws for quite some time, and I therefore am puzzled why the Court creates a new one today.   See 43 CFR § 3812.1 (1982) ("Whatever is recognized as a mineral by the standard authorities, whether metallic or other substance, when found in public lands in quantity and quality sufficient to render the lands valuable on account thereof, is treated as coming within the purview of the mining laws"); see n. 4, *infra*.

[2] The Government's claim is less inclusive because all parties agree that to hold that the homesteader has no right to use sand, gravel, and other common substances for his own purposes would pose a considerable impediment to the task of establishing a home and raising stock, undoubtedly the most important policies underlying the SRHA and the other Homestead Acts.   See *infra*, at 71.   The Court's solution to the rancher's problem is to allow the owner of the surface estate to use reserved minerals where such use is essential for stockraising and raising crops.   See *ante*, at 54–55, n. 14.   Thus, the Court apparently would give ranchers this free use of *all* reserved minerals, including "coal," which is specifically mentioned in 43 U. S. C. § 299.   I am not sure this Court should so lightly suggest such a broad exception to the mineral rights reserved by Congress.   Moreover, such a free-use exception only invites litigation over what is a domestic use, who is a rancher, what is a ranch, what rights successors-in-interest have, and what rights a developer may have to halt such free use of "its" minerals.

[3] My list is not exclusive.   "Landowners have sold 'moss rock,' common rock on which moss has grown, to contractors to decorate fireplaces and

As I read the Court's opinion it could leave Western homesteaders with the dubious assurance that only the dirt itself could not be claimed by the Government. It is not easy to believe that Congress intended this result.

## I

In construing a congressional Act, the relevant intent of Congress is that existing at the time the statute was enacted. See *Andrus* v. *Charlestone Stone Products Co.*, 436 U. S. 604, 611, and n. 8 (1978); *Winona & St. Peter R. Co.* v. *Barney*, 113 U. S. 618, 625 (1885). The Court avoids this rule of construction by largely ignoring the stated position of the Department of the Interior before 1916 that gravel—like sand and clay—was not a mineral.

In 1916, when the SRHA was enacted, the Department of the Interior's rule for what it considered to be a "valuable mineral deposit" as those terms are used under the general mining laws[4] was clear: "[W]hatever is recognized as a mineral by the standard authorities on the subject, whether of metallic or other substances, when the same is found in the public lands in quantity and quality sufficient to render the

---

homes. The rock has become 'valuable,' but it is absurd to think that this common rock should now be included in a mineral reservation to the government." Case Note, 18 Land & Water L. Rev. 201, 216 (1983).

[4] By the phrase "general mining laws," I refer primarily to the Mining Act of 1872, as amended, 30 U. S. C. § 21 *et seq.*, which declares that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase . . . ." § 22. See generally *ante*, at 50–51. As the Court notes, *ante*, at 39, mineral exploitation of SRHA lands was made subject to the same restrictions that characterize development of lands under the general mining laws, and thus the interpretation of those laws is directly pertinent to determining congressional intent in 1916. It should be noted, however, that since 1955 it has been clear that a gravel deposit could *not* be "a valuable mineral deposit" under the general mining laws. See 30 U. S. C. § 611. The issue in this case is thus limited to the right of the Government to claim gravel found on SRHA lands, patented to private owners, even though the general mining laws still apply as to most minerals, but not to gravel.

land more valuable on account thereof than for agricultural purposes, should be treated as coming within the purview of the mining laws." *Pacific Coast Marble Co.* v. *Northern Pacific R. Co.,* 25 L. D. 233, 244–245 (1897). See Letter from Commissioner Drummond to Surveyors-General, Registers, and Receivers (July 15, 1873) (reprinted in H. Copp, Mineral Lands 61, 62 (1881)). It is important to note that the Department's test had two parts. First, before a substance would cause the Department to characterize land as mineral, it had to be recognized as a mineral by the standard authorities on the subject. See n. 1, *supra.* Second, the mineral had to appear in sufficient quantity and quality to be commercially exploitable.[5]

Under the Department of the Interior's earliest decisions, certain commonplace substances were classified as minerals. See *W. H. Hooper,* 1 L. D. 560, 561 (1881) (gypsum); *H. P. Bennet, Jr.,* 3 L. D. 116, 117 (1884) (permitting placer claims for building stone). But the Department soon began to recognize a small group of substances, that were valuable for certain purposes, as not being "minerals" "under all authorities." In *Dunluce Placer Mine,* 6 L. D. 761, 762 (1888), the Secretary held that a deposit of "brick clay" would not warrant classification as a valuable mineral deposit. The Secretary so held despite a finding that the land on which the deposit was found was "undoubtedly more valuable as a 'clay placer' than for any other purpose." *Id.,* at 761.

The Department followed *Dunluce* in a number of subsequent cases.[6] An important case under the general mining

---

[5] Cf. 1 C. Lindley, American Law Relating to Mines and Mineral Lands § 98, pp. 174–175 (3d ed. 1914). The test whether a claimant has located a "valuable mineral deposit" under the general mining laws remains for the most part the same. See *ante,* at 44. As JUSTICE MARSHALL concluded for a unanimous Court in *Andrus* v. *Charlestone Stone Products Co.,* 436 U. S. 604, 610 (1978), mineral land must contain a deposit that *both* is a "mineral" and is "valuable."

[6] See, *e. g., King* v. *Bradford,* 31 L. D. 108, 109–111 (1901) (brick clay); *Bettancourt* v. *Fitzgerald,* 40 L. D. 620, 621–622 (1912) (clay useful for

laws for our purposes is *Zimmerman* v. *Brunson*, 39 L. D. 310 (1910). It involved sand and gravel, and was decided four years before Congress began consideration of the SRHA. After quoting the rule in *Pacific Coast Marble*, the Secretary stated:

> "A search of the standard American authorities has failed to disclose a single one which classifies a deposit such as claimed in this case as mineral, nor is the Department aware of any application to purchase such a deposit under the mining laws. This, taken into consideration with the further fact that deposits of sand and gravel occur with considerable frequency in the public domain, points rather to a general understanding that such deposits, unless they possess a peculiar property or characteristic giving them a special value, were not to be regarded as mineral." 39 L. D., at 312.

The Secretary then reviewed the Department's cases on clay and stone,[7] concluding:

---

cement manufacturing); *Holman* v. *Utah*, 41 L. D. 314, 315 (1912) (clay and limestone); *Victor Portland Cement Co.* v. *Southern Pacific R. Co.*, 43 L. D. 325, 326 (1914) (limestone shale); *Mrs. A. T. Van Dolah*, Solicitor's Opinion A–26443 (Oct. 14, 1952) (clay). See also *Gray Trust Co.*, 47 L. D. 18, 20 (1919) (limestone useful in cement and road surfacing found not to qualify land as mineral land); *Union Oil Co.*, 23 L. D. 222, 229 (1896) (petroleum) (overruled by Congress in Act of Feb. 11, 1897, ch. 216, 29 Stat. 526); *Jordan* v. *Idaho Aluminum Min. & Mfg. Co.*, 20 L. D. 500, 501 (1895) (alumina) (but see *Downey* v. *Rogers*, 2 L. D. 707, 709 (1883) (permitting entry for alum); *Tucker* v. *Florida R. & Navigation Co.*, 19 L. D. 414 (1894) (phosphate) (overruled in *Pacific Coast Marble Co.* v. *Northern Pacific R. Co.*, 25 L. D. 233, 246–247 (1897)). Cf. *Southwestern Mining Co.*, 14 L. D. 597, 602 (1892) (salt) (relying on consistent legislative policy to reserve saline lands from all land Acts).

[7] Stone useful for building purposes was not classified as a mineral—at least for a time. See *Conlin* v. *Kelly*, 12 L. D. 1, 2–3 (1891) (declining to follow *H. P. Bennet, Jr.*, 3 L. D. 116, 117 (1884)); *Clark* v. *Ervin*, 16 L. D. 122, 124 (1893); *Hayden* v. *Jamison*, 16 L. D. 537, 539 (1893); *Florence D. Delaney*, 17 L. D. 120, 121 (1893) (glass sand and building stone); Act of Aug. 4, 1892, 27 Stat. 348, 30 U. S. C. § 161 (making building

> "From the above resume it follows that the Department, in the absence of specific legislation by Congress, will refuse to classify as mineral land containing a deposit of material not recognized by standard authorities as such, whose sole use is for general building purposes, and whose chief value is its proximity to a town or city, in contradistinction to numerous other like deposits of the same character in the public domain. *Id.*, at 313.

The Secretary concluded that gravel was such a material, and this clearly remained the Department's position until 1929.

The *Zimmerman* decision was recognized by Department officials in *Litch* v. *Scott*, 40 L. D. 467, 469 (1912), as foreclosing "the question as to the mineral character of the land," even though "it [did] not appear that the [claimant's] removal of the sand or gravel had any connection with the cultivation of the land and it was removed solely for the purpose of sale." And in *Hughes* v. *Florida*, 42 L. D. 401 (1913), First Assistant Secretary Andreius A. Jones wrote: "The Department does not concur with the contention that this deposit [of shell rock] is a mineral within the meaning of the general mining laws. It presents features greatly similar to the deposits of sand and gravel considered in the case of Zimmerman *v.* Brunson. . . ." *Id.*, at 403–404.

Thus, it was beyond question, when the SRHA was adopted in 1916, that the Department had ruled consistently that gravel was not a mineral under the general mining laws.[8] The legislative history is silent on exactly how Con-

---

stone a locatable mineral). Cf. *Stanislaus Electric Power Co.*, 41 L. D. 655, 658–661 (1912) (§ 161 does not apply to common, low-grade rock having no special value for building purposes). The Department, however, later recognized claims founded on stone deposits that could be used for special purposes, such as monuments and ornamentation. See *McGlenn* v. *Wienbroeer*, 15 L. D. 370, 374 (1892).

[8] In *United States* v. *Aitken*, 25 Philippine 7 (1913), the court held that *commercial* gravel was not a mineral. Relying on the Department's administrative decisions, the court defined "mineral" as " '[w]hatever is recognized as a mineral by the standard authorities on the subject.' " *Id.*, at

gress defined "mineral," but it is equally clear that the Department participated actively in drafting the SRHA and in advising Congress.[9] In light of this record, one must conclude that Congress intended the term "minerals" in the new statute to have the meaning so recently and consistently given it by the Department in construing and applying the general mining laws.[10] As it was the agency authorized to

15 (quoting Letter from Commissioner Drummond to Surveyors-General, Registers, and Receivers (July 15, 1873)). The court found that if "an examination be made of the individual adjudicated cases and the decisions of the United States Land Department, upon which these general definitions of the term 'mineral' are based, it will be found that commercial gravel was not a factor in forming them, and that it has never been considered as a mineral." *Id.*, at 16. See D. Barringer & J. Adams, Law of Mines and Mining cxxv (1900) (list of 46 nonmetallic minerals that possess commercial value, but not listing gravel); D. Barringer, Minerals of Commercial Value (1897) (listing over 350 substances, including clay, petroleum, phosphate, salt, but not listing sand or gravel); 2 C. Lindley, *supra* n. 5, § 424, at 996–997 (recognizing Department's policy for "commonplace substances such as ordinary clay, sand and gravel"); 1 W. Snyder, Mines and Mining § 144, p. 117 (1902) (discussing Department's policy not to treat clay as a mineral).

[9] In 1914, a bill to permit homesteading on unappropriated public lands in the West was referred by the House Committee on Public Lands to the Department of the Interior for comment. First Assistant Secretary Jones, six months after deciding *Hughes* v. *Florida*, 42 L. D. 401 (1913), submitted the Department's report on the bill and at the same time submitted the Department's draft of a substitute Stock-Raising Homestead Bill. After Committee hearings on the bills, Jones issued a second report to the Committee. See H. R. Rep. No. 626, 63d Cong., 2d Sess., 1–9 (1914). The House passed the Department's bill, but the full Senate failed to act on it. In the next Congress, the Department's bill was reintroduced in the House. Again the Public Lands Committtee sought the advice of the Department. See H. R. Rep. No. 35, 64th Cong., 1st Sess., 4–8, 13 (1916). In the floor debates, Members made frequent reference to the fact that the Department had drafted the bill. See, *e. g.*, 53 Cong. Rec. 1127 (1916) (statement of Congressman Taylor) (describing Department's report as "one of the best reports we have ever had on any bill since I have been in Congress"); *id.*, at 1130–1131.

[10] The Court concludes that "[i]t is most unlikely that many Members of Congress were aware of the ruling in *Zimmerman*, which was never tested

implement the SRHA, its contemporaneous construction should be persuasive as to congressional intention. This Court previously had accorded this respect to the Department of the Interior. See, *e. g., Burke* v. *Southern Pacific R. Co.*, 234 U. S. 669, 677–678 (1914); *Northern Pacific R. Co.* v. *Soderberg*, 188 U. S. 526, 534 (1903).

## II

Despite the absence of "specific legislation by Congress," the Department in *Layman* v. *Ellis*, 52 L. D. 714 (1929), which did not involve SRHA lands, overruled *Zimmerman* 13 years after the enactment of the SRHA.[11]  See 52 L. D., at

in the courts and was not mentioned in the Reports or debates on the SRHA." *Ante*, at 46. The Court generally does not attribute such ignorance of the law to Congress. See, *e. g., Lorillard* v. *Pons*, 434 U. S. 575, 581 (1978); *National Lead Co.* v. *United States*, 252 U. S. 140, 147 (1920). And assuming ignorance seems especially inappropriate in this case, where during floor debates Congressmen referred to the Department's administrative decisions and its interpretations of prior Homestead Acts. See 53 Cong. Rec. 1174 (1916). See also n. 9, *supra*.

Alternatively, the Court states that, "[e]ven if Congress had been aware of *Zimmerman*, there would be no reason to conclude that it approved of the Secretary's ruling in that case rather than this Court's opinion in [*Northern Pacific R. Co.* v.] *Soderberg*, [188 U. S. 526, 530 (1903)], which . . . quoted with approval a statement that gravel is a mineral." *Ante*, at 46. I do not believe that the *Soderberg* Court's one quotation from an English case is of greater relevance than the established views of the Department that is entrusted with the administration of the Federal Government's public lands and that drafted the very Act before us now. Certainly the *Soderberg* Court did not think so, for in searching for a definition of the word "mineral," it first examined "[t]he rulings of the Land Department, to which we are to look for the contemporaneous construction of these statutes." 188 U. S., at 534. And the holding of *Soderberg* as to the classification of granite was not at all inconsistent with Department policy. See n. 7, *supra*.

[11] *Layman* v. *Ellis* has been reaffirmed in subsequent opinions of the Department, but most of them provide the Court with none of the support it seeks in them. The Court also looks to two federal land-grant statutes that, like the SRHA, reserve all minerals to the United States. *Ante*, at 56–57. See *United States* v. *Isbell Construction Co.*, 78 I. D. 385, 391,

721. As a result, individuals began staking mining claims on public land containing gravel deposits to obtain land patents, not for "mineral" value, but for such purposes as fishing camps and cabin sites. See H. R. Rep. No. 730, 84th Cong., 1st Sess., 5–6 (1955). Legislation in 1955 clarified the confusion that the Department's decisions had created.[12] Ulti-

---

394–396 (1971); Dept. of Interior, Division of Public Lands, Solicitor's Opinion, M–36379 (Oct. 3, 1956). Relying on a prior opinion of the Department's Solicitor, the Secretary in *Isbell* reversed the decision of the Director of the Bureau of Land Management holding that gravel was included in the patent. Moreover, the statute at issue in *Isbell* was passed after the Department's decision in *Layman*, and differed in purpose and history from the SRHA. As the Department itself noted in this case, the statute there also differed from the SRHA as written in 1916 in that it originally provided from the date of its enactment for compensation for damages to the lands as well as to improvements. See 85 I. D. 129, 132, n. 2 (1978). The 1956 Solicitor's Opinion simply relied on *Layman*. Interestingly, it took a much narrower view of what was included in the mineral reservation at issue there than the Court has with respect to the SRHA reservation: "[D]eposits of sand and gravel in lands . . . patented under the act which can be shown *as of the date of . . . patent* to have a definite economic value *by reason of the existence and nearness of a market* in which they can be sold at a profit are reserved . . . ." Solicitor's Opinion M–36379, *supra,* at 4 (emphasis added).

[12] In a series of Acts culminating in the Surface Resources Act of 1955, 30 U. S. C. § 611, Congress removed such commonplace "materials" as gravel completely from the purview of the general mining laws. It is arguable, from this fact alone, that Congress never intended gravel to be a mineral under any of the mining laws. See *United States* v. *Coleman,* 390 U. S. 599, 604 (1968) (" '[S]and, stone, [and] gravel . . . are really *building materials,* and are not the type of material contemplated to be handled under the mining laws . . .' ") (quoting 101 Cong. Rec. 8743 (1955)) (emphasis added by Court). Indeed, some officials in the Department initially concluded that under the Surface Resources Act "sand and gravel have been declared to be nonmineral substances and should therefore no longer be considered as being reserved to the United States under the mineral reservation in the [SRHA]." Dept. of Interior, Division of Public Lands, Solicitor's Opinion, M–36417, p. 1 (Feb. 15, 1957). Assuming, however, that the Department eventually may have concluded properly that the Act did not quitclaim common materials to SRHA patentees, see *id.,* at 2, it is nevertheless difficult for the Department to contend that the Act is irrelevant

mately, sand and gravel were once again removed from the coverage of the general mining laws;[13] Congress reaffirmed the *Zimmerman* rule that common gravel is not a mineral under the general mining laws;[14] and *Layman* was legislatively overruled.[15]

---

to the inquiry whether the Government had title to the gravel in the first instance. Interestingly, the Act specifically permits continued location on public lands of gravel with "distinct and special value," § 611, the same test set forth in *Zimmerman* for determining when a deposit of gravel would be considered a "valuable mineral deposit." See *United States* v. *Kaycee Bentonite Corp.*, 89 I. D. 262, 274 (1982) (1955 congressional test "echoes" *Zimmerman* test).

[13] While the Department's authority to dispose of gravel on "public lands" is clear, see n. 4, *supra*, it is not at all clear with respect to gravel on SRHA lands. The Court assumes without discussion agency jurisdiction to bring a trespass action on SRHA lands under regulations that authorize such actions for trespass on "public lands." Yet there at least is doubt that SRHA lands are "public lands" as that term has been interpreted by this Court. See, *e. g.*, *Bardon* v. *Northern Pacific R. Co.*, 145 U. S. 535, 538 (1892); Mall, Federal Mineral Reservations, 20 Rocky Mt. Min. L. Inst. 399, 443–449 (1975). Furthermore, even if SRHA lands are public lands and gravel is reserved, the Department's regulations apparently fail to permit disposal of minerals for these lands. See 30 U. S. C. § 601; 43 CFR § 3601.1 (1982) (stating that "mineral material disposals" may not be made from "public lands" on which there are "valid, existing claims to the land by reason of settlement, entry, or similar rights obtained under the public land laws"). Thus, the Court's extended discussion of the policy of encouraging mineral development on SRHA lands has little relevance with respect to gravel and other commonplace substances. Indeed, if this case is any indication, it rather appears that the Government wants to prevent development of such materials.

[14] The anomalous status of *Layman* and common varieties of gravel has not escaped the notice of the Department, which has commented that "the arguments advanced by the Department for overruling *Zimmerman* are difficult to distinguish from rationales that would support making common clay locatable." *Kaycee Bentonite, supra*, at 274, n. 9.

[15] See n. 12, *supra*. The Court relies on a dozen federal administrative and judicial cases since *Layman* but involving pre-1955 locations for the proposition that gravel deposits could be located under the general mining laws. See *ante*, at 57–58. But none of these cases involves SRHA land, they were concerned primarily with the application of the marketability

It is clear then that Congress never has, as the Court holds, considered all gravel to be a valuable mineral.[16]   And I see no basis for inferring congressional intent to classify gravel, contrary to all lay understanding, as mineral.[17]

---

test, and none questioned whether gravel was a mineral.   The issue here, however, is whether gravel should ever be considered a "mineral" under the SRHA, and the cases are at the most evidence of how gravel should be treated on "public lands" under the mining laws *after Layman* and *before* Congress in 1955 removed all gravel from the purview of the mining laws. See n. 13, *supra*.   The only prior case addressing the precise issue before the Court held that ordinary sand and gravel were *not* reserved to the United States within the meaning of the mineral reservation contained in SRHA patents.   See *State ex rel. Highway Comm'n v. Trujillo*, 82 N. M. 694, 487 P. 2d 122 (1971).   Similar cases also suggest that gravel is not a reserved mineral.   Cf. *United States v. Union Oil Co. of California*, 549 F. 2d 1271, 1279 (CA9) (SRHA reserved "unrelated subsurface resources"), cert. denied, 434 U. S. 930 (1977); *Bumpus v. United States*, 325 F. 2d 264 (CA10 1963) (finding a mineral reservation following condemnation not to include gravel).

[16] Not even the Department has gone as far as the Court apparently would.   Although *Layman* made common varieties of gravel locatable, gravel that "is principally valuable for use as fill, sub-base, ballast, riprap or barrow was *never* [a valuable mineral deposit]," despite the fact that it "might be marketable at a profit." *United States v. Verdugo & Miller, Inc.*, 37 I. B. L. A. 277, 279 (1978) (emphasis in original).   See Tr. of Oral Arg. 50.

[17] The Court relies heavily on the rule that land grants are construed favorably to the Government.   See *ante*, at 59–60.   The Court fails to note, however, that we recently made clear that, notwithstanding this rule, public grants are " 'not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication.' " *Leo Sheep Co. v. United States*, 440 U. S. 668, 682–683 (1979) (quoting *United States v. Denver & Rio Grande R. Co.*, 150 U. S. 1, 14 (1893)).   See *Burke v. Southern Pacific R. Co.*, 234 U. S. 669, 679 (1914) (Congress intended "mineral lands" to be applied "in their ordinary and popular sense"); *id.*, at 676 ("doubtless the ordinary or popular signification of that term was intended"); *Marvel v. Merritt*, 116 U. S. 11, 12 (1885) (statutory terms "mineral . . . substances" have no "scientific meaning different from their popular meaning").   A good indicator of the "ordinary and popular sense" of a word is the common law's use of it.   The Court ignores this.   See Reeves, The Meaning of the Word "Minerals," 54

### III

Congressional interest in stockraising and mineral development was subordinate to the ultimate congressional purpose of settling the West. See H. R. Rep. No. 35, 64th Cong., 1st Sess., 14 (1916); H. R. Rep. No. 626, 63d Cong., 2d Sess., 10–11 (1914); n. 2, *supra.* More than cattle and more than minerals, it was the belief of Congress that

> "the Nation as a unit needs more States like, for instance, Kansas and Iowa, *where each citizen is the sovereign of a portion of the soil,* the owner of his home and not tenant of some (perhaps) distant landlord, a builder of schools and churches, a voluntary payer of taxes for the support of his local government." H. R. Rep. No. 626, *supra,* at 11 (emphasis added).

In recommending "citizen sovereignty" of the soil,[18] Congress surely did not intend to destroy that sovereignty by reserv-

---

N. D. L. Rev. 419, 472 (1978) ("As a general rule . . . sand and gravel are usually held not to be a mineral in private grants or reservations of minerals"); *id.,* at 431; Brief for United States in *Bumpus* v. *United States,* 325 F. 2d 264 (CA10 1973), pp. 7–14 (construing declaration of taking's mineral reservation as not reserving gravel to former landowners).

[18] Quite apart from the clear evidence of congressional intent at the time the SRHA was enacted in 1916, see Part I, *supra,* it is unreasonable to suppose that Congress ever intended—when it was enacting legislation to encourage settlement of the West—to reserve to the Federal Government the commonplace inorganic substances that actually constituted the soil of the patented land. The incentive to move to the West and settle on its semiarid land would have been diminished significantly if it had been understood that only limited rights in what most persons consider a part of the soil itself were being granted. Indeed, the legislative history is clear that, rather than intending to provide rights analogous to grazing leases upon the unappropriated public domain, Congress intended to promote permanent settlement. See 53 Cong. Rec. 1233–1234 (1916) (statement of Congressman Mondell) ("I wish [the Congressman] would not call the laws he refers to surface-entry laws, for they are not. They convey fee titles. They give the owner much more than the surface; they give him all except the body of the reserved mineral").

ing the commonplace substances that actually constitute much of that soil.[19]

The first attempt by the Department of the Interior to acquire ownership of gravel on SRHA lands did not occur until this case began in 1975. One would think it is now too late, after a half-century of inaction, for the Department to take action that raises serious questions as to the nature and extent of titles to lands granted under the SRHA.[20] Owners of patented land are entitled to expect fairer treatment from their Government. In my view, the Department should be required to adhere to the clear intent of Congress at the time this legislation was adopted. I would affirm the judgment of the Court of Appeals.

JUSTICE STEVENS, dissenting.

Whether gravel is a mineral within the meaning of the Stock-Raising Homestead Act of 1916 may be a matter of

---

[19] Cf. H. R. Rep. No. 626, *supra* n. 9, at 3 (surface owners' activities "can be carried on without being materially interfered with by the reservation of minerals and the prospecting for a removal of same from the land"). Based on similar concerns, the Department on occasion has limited the breadth of mineral reservations because of the obvious congressional intent. See Solicitor's Opinion M–36379, *supra* n. 11, at 4.

[20] The Department is in no position to adopt a new policy for land patents long granted. See *Andrus* v. *Shell Oil Co.*, 446 U. S. 657 (1980). Its prior actions have caused the population generally, including respondent, to understand that gravel was not a reserved mineral. Cf. *Western Nuclear, Inc.* v. *Andrus*, 475 F. Supp. 654, 660 (Wyo. 1979) ("Until [1975], it was the practice of the Wyoming Highway Department, construction companies, and the ranchers owning the surface estate to treat the gravel as part of the surface estate, the gravel being sold or used by the rancher with the approval of the [Bureau of Land Management]"). As JUSTICE REHNQUIST stated for the Court in *Leo Sheep Co.*, *supra:*

"Generations of land patents have issued without any express reservation of the right now claimed by the Government. Nor has a similar right been asserted before . . . . This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations . . . ." 440 U. S., at 687 (footnotes omitted).

considerable importance in the semiarid lands of the West, but it is of much less importance to the rest of the Nation. For that reason, as well as those set forth at some length in my concurring opinion in *Watt* v. *Alaska*, 451 U. S. 259, 273 (1981), I believe the Court of Appeals should have been permitted to make the final decision upon the unique question of statutory construction presented by this case.* Accordingly, while I join JUSTICE POWELL's opinion explaining why the judgment of the Court of Appeals should be affirmed, I believe an even better disposition would have been simply to deny certiorari.

---

*What I said two years ago remains true today:

"The federal judicial system is undergoing profound changes. Among the most significant is the increase in the importance of our courts of appeals. Today they are in truth the courts of last resort for almost all federal litigation. Like other courts of last resort—including this one—they occasionally render decisions that will not withstand the test of time. No judicial system is perfect and no appellate structure can entirely eliminate judicial error. Most certainly, this Court does not sit primarily to correct what we perceive to be mistakes committed by other tribunals. Although our work is often accorded special respect because of its finality, we possess no judicial monopoly on either finality or respect. The quality of the work done by the courts of appeals merits the esteem of the entire Nation, but, unfortunately, is not nearly as well or as widely recognized as it should be. Indeed, I believe that if we accorded those dedicated appellate judges the deference that their work merits, we would be better able to resist the temptation to grant certiorari for no reason other than a tentative prediction that our review of a case may produce an answer different from theirs. In my opinion, that is not a sufficient reason for granting certiorari." 451 U. S., at 275 (footnote omitted).