# United States Court of Appeals for the Federal Circuit

03-1395


ROBERT HASH, GERLENE HASH,
WILLIAM DON LAKEY, and NANCY HAWKINS,

Plaintiffs-Appellants,

v.


UNITED STATES,

Defendant-Appellee.


Cecilia Fex, Ackerson Kauffman Fex, PC, of Washington, DC, argued for plaintiffs-appellants. With her on the brief was Nels J. Ackerson. Of counsel on the brief was Daniel J. Millea, Zelle, Hofmann, Voelbel, Mason & Gette, LLP, of Minneapolis, Minnesota. Of counsel were John B. Massopust and Timothy W. Regan.

Katherine J. Barton, Deputy Assistant Attorney General, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was Kathryn E. Kovacs, Attorney.

Andrea C. Ferster, General Counsel, Rails-to-Trails Conservancy, of Washington, DC, for amicus curiae Rails-to-Trails Conservancy.

Appealed from: United States District Court for the District of Idaho

Magistrate Judge Mikel H. Williams

# United States Court of Appeals for the Federal Circuit

03-1395

ROBERT HASH, GERLENE HASH,
WILLIAM DON LAKEY, and NANCY HAWKINS,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: April 4, 2005

_____

Before NEWMAN, LOURIE, and LINN, Circuit Judges.

NEWMAN, Circuit Judge.

Robert Hash, Gerlene Hash, William Don Lakey, and Nancy Hawkins bring this class action affecting approximately two hundred Idaho landowners. The landowners appeal those aspects of the decision of the United States District Court for the District of Idaho as were decided adversely to their "taking" claims under the Fifth Amendment,[1] arising from

---

1    Hash v. United States, No. CV99-324 (D. Idaho Mar. 10, 2003) (final judgment); (D. Idaho July 7, 2000) (class certification).

the conversion of a railroad right-of-way to a recreational trail traversing their lands.  We reverse in part, vacate in part, and remand for further proceedings.

BACKGROUND

In the early to mid-1800s the United States strongly encouraged railroad construction by private enterprise, through various incentives including the grant to the railroads of substantial amounts of public land.  This policy duly fell into disfavor, and was replaced by the less-generous but still incentive-rich policy embodied in the General Railroad Right-of-Way Act of 1875, codified at 43 U.S.C. §§934-939 ("the 1875 Act") (repealed in part, Pub. L. 94-579, Title VII §706(a), 90 Stat. 2793 (1976)).  The 1875 Act governed railroad rights of access across public lands for the ensuing century:

> The right of way through the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, . . . , to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

43 U.S.C. §934.  Section 4 of the 1875 statute provided that

> Any railroad company desiring to secure the benefits of sections 934 to 939 of this title, shall . . . file with the officer, as the Secretary of the Interior may designate, of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way.

43 U.S.C. §937.

Concurrently with encouraging the construction of railroads, the nation also encouraged settlement of the western lands through the Homestead Act of 1862, 12 Stat. 392, 43 U.S.C. §161 (repealed, 90 Stat. 2787 (1976)). The Homestead Act entitled qualifying settlers to acquire up to 160 acres of public land by "enter[ing] one quarter-section or a less quantity of unappropriated public lands." 43 U.S.C. §161. Land patents were duly granted by the Interior Department for lands settled pursuant to the Homestead Act.

Many railroad lines were built in the latter 1800s and early 1900s. Then, with the development of motor transport, rail traffic diminished, and since 1920 almost half of the nation's 270,000 miles of rail lines have gone out of use. The National Trails System Act Amendments of 1983, codified as amended at 16 U.S.C. §§1241-51, provides for the preservation of discontinued railway rights-of-way, by "banking" the rights-of-way for possible future reactivation; the Trails Act authorizes interim use of the rights-of-way as recreational trails.

The rights-of-way here at issue carried the Pacific and Idaho Northern Railroad Co. ("the Railroad"), a line constructed between 1899 and 1911. In 1995 the Interstate Commerce Commission authorized the Railroad to discontinue part of its operation in Idaho, and in December of that year the 83.1 mile stretch here at issue was authorized to be converted to use as a recreational trail.

It is no longer subject to question that the United States may by legislative act prevent reversion of discontinued railway rights-of-way, and authorize their interim use as recreational trails. See Preseault v. Interstate Commerce Comm'n, 494 U.S. 1 (1990). The questions here raised relate to the consequences of these actions for the owners of the

land traversed by the right-of-way. Specific to the case before us, there arise questions involving federal and state laws governing easements, fee interests, and reversionary rights. These questions require determination of the interests of the Railroad, these landowners, and the federal government, as to various segments of this Railroad's right-of-way and the land it traverses.

The Railroad acquired the segments of right-of-way here at issue between 1899 and 1905, traversing both public and private lands. The appellants argue that the right-of-way across their lands was simply an easement for railway use, and that when the Railroad abandoned such use the easement would have reverted to them as owners of the servient estate, but for the 1983 provisions of the Trails Act. Thus they claim that the conversion to a recreational trail was a taking of their property, for which they are due just compensation. In Preseault v. ICC, 494 U.S. 1, the Court held that if abandonment of railway use and application of the Trails Act effects a taking when the easement would otherwise revert to the owner of the servient estate, the landowner may sue for compensation under the Tucker Act. 494 U.S. at 4-5 ("We find it unnecessary to evaluate the merits of the takings claim because we hold that even if the rails-to-trails statute gives rise to a taking, compensation is available to petitioners under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982 ed.), and the requirements of the Fifth Amendment are satisfied.") See also Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996) (*en banc*) (applying state law of reverter to determine rights of the owner of the servient estate).

The appellants are successors to homesteaders who were granted land patents pursuant to the Homestead Act of 1862. Some of the original owners were granted their land after the Railroad had acquired its right-of-way pursuant to the 1875 Act, while the land

was public land. Some of the original owners were granted their land before the Railroad obtained the right-of-way traversing that land; these segments of the right-of-way were conveyed by the landowners to the railroad on a variety of terms and conditions. And some segments of the right-of-way are devoid of documentation, whereby the parties agreed that these rights would be determined under the Idaho law of adverse possession.

This appeal is taken under Fed. R. Civ. P. 54(b) from suit in the district court brought under the Little Tucker Act, 28 U.S.C. §1346(a)(2), and is appealed in accordance with 28 U.S.C. §1295(a)(2). The district court's rulings on constitutional and statutory construction are given plenary review, see Romero v. United States, 38 F.3d 1204, 1207 (Fed. Cir. 1994), as are the district court's constructions of state law, Abbott Labs. v. Brennan, 952 F.2d 1346, 1355 (Fed. Cir. 1991). Findings of fact by the district court are reviewed on the clearly erroneous standard. Allen Engineering Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1344-45 (Fed. Cir. 2002).

## DISCUSSION

The primary issue is whether the claimant landowner owns the estate underlying the Railroad right-of-way, or whether the underlying estate never left its ownership by the United States, or whether the estate was deeded in fee to the Railroad.

At the district court's request, the parties divided the plaintiff class into categories based on the different mechanisms and legal forms whereby the Railroad acquired the various segments of the 83.1 miles of right-of-way. There were initially fourteen categories, not all of which are involved in this appeal. Category 1 is for those landowners who obtained their land, pursuant to the Homestead Act, after the Railroad had acquired its right-of-way traversing then-public land pursuant to the 1875 Act. All of the other

03-1395                                    5

categories relate to landowners who already owned the land before the Railroad obtained a right-of-way traversing it. The district court summarized its decision as follows:

> (1) the United States held a reversionary interest in the rights of way in Category 1; (2) the interests conveyed in Categories 2 and 3 reverted back to the grantors; (3) the Railroad acquired fee simple title to deeds in Categories 4 and 7; (4) the deeds in Categories 5, 6, and 8 conveyed fee title to the Railroad; (5) the Railroad was not prevented from acquiring fee title to deeds in Categories 9 and 14; and (6) the Railroad acquired fee title to lands adversely possessed in Category 10.

Hash v. United States, Order of Mar. 10, 2003 at 2 n.1.

## *Category 1*

For this category the Railroad obtained the right-of-way over public lands before any transfer of these lands under the Homestead Act. The landowners in Category 1 state that the rights acquired by the Railroad from the United States were an easement flowing with the land, and not a fee interest in the underlying property. The landowners state that, in accordance with the 1875 Act and the terms of their land patents, they were granted the underlying fee. The government's position in the district court was that it owns the reversionary interest on abandonment of the right-of-way. In Preseault, 100 F.3d at 1533, this court explained that having the "reversionary interest" in an easement is the same as having the fee in the land occupied by the easement burdened by the easement itself. On appeal the government argues various modifications of this theory, to the effect that whatever the rights acquired by the Railroad and by the landowners, on abandonment of the right-of-way the United States owns the reversionary interest and thus owns the rail corridor in fee.

The issue of the nature and scope of grants of rights-of-way under the 1875 Act has been extensively litigated, most often in connection with a railway's claims to mineral rights underlying its right-of-way. The weight of authority has resolved the question on the side of limiting the railway's rights to a surface easement, over a century of legislation, litigation, and jurisprudence. In Great Northern Ry. Co. v. United States, 315 U.S. 262, 277 (1942) the Court extensively reviewed the rights of railway, government, and land patentee, and explained: "That petitioner [railway] has only an easement in its rights of way acquired under the Act of 1875 is therefore clear from the language of the Act, its legislative history, its early administrative interpretation and the construction placed upon it by Congress in subsequent enactments." The Court applied this construction to the dispute in that case, and held that the railroad acquired only a surface easement, and the owner of the fee owned the mineral rights. Again in United States v. Union Pacific Railroad Co., 353 U.S. 112, 119 (1957), the Court, discussing a pre-1875 statute, described the grant of a right-of-way to the railway as "all surface rights to the right of way and all [nonsurface] rights incident to a use for railroad purposes." The Court explained that the railway acquired only an easement.

The question for the Category 1 landowners is whether, for the segments of rights-of-way granted over public lands in accordance with the 1875 Act, the ownership of the underlying land remained with the United States for lands subsequently patented to settlers under the Homestead Act. The district court held that the ownership never left the United States and that the land patentee received no rights therein, and therefore had no reversionary right on discontinuance of the railway right-of-way.

The appellants state that the district court erred in interpretation and application of the 1875 Act. They state that their Homestead Act lands were held by them in fee simple, subject to the railway easements as provided by the 1875 Act, and that when the easements were relinquished, their land was simply disencumbered. As support the appellants cite the statutory language, its contemporaneous explanations and regulations, its administration over the ensuing century, and precedent such as Great Northern. The government disputes this interpretation, arguing that various enactments and decisions and current policy show that there was no governmental intention to relinquish ownership of the underlying land. Thus the government argues that it is irrelevant that the patent that was granted to a settler included within its metes and bounds the entirety of the estate including the land carrying the right-of-way, and that the government retained the fee to the land underlying the right-of-way.

The appellants stress the well-recognized rule that property rights that are not explicitly reserved by the grantor cannot be inferred to have been retained. The land patents granted pursuant to the Homestead Act reserved to the United States certain specified rights, viz. previously vested and accrued water rights, previously granted mineral rights, and rights-of-way for ditches or canals. None of these patents mentions retaining or reserving to the United States any title or other ownership interest or reversion right in the land underlying previously granted railroad rights-of-way. See Boesche v. Udall, 373 U.S. 472, 477 (1963) (a land patent "divests the government of title").

The 1875 Act contemplated that public land carrying a railway right-of-way would be "disposed of," and provided that existing rights-of-way would be preserved if they were

registered in the Interior Department's local land office. Section 4 of the 1875 Act, quoted ante, recognized that:

> all such lands over which such right of way shall pass shall be disposed of subject to such right of way.

43 U.S.C. §937. By making the disposition of such lands "subject to" the right-of-way, the Act explicitly negated the theory that these lands were not included in the "disposition." To the contrary, the Act recognized the future disposition of the lands over which the right-of-way passes. The government nonetheless insists -- and the district court held -- that the government retained ownership of the underlying lands.

The appellants do not dispute that their Homestead Act land grant was subject to the pre-existing railway easement, but they argue that the fee to the lands underlying the right-of-way was conveyed when the Homestead Act land patents were granted to their predecessors. A contemporaneous Interior Department regulation reinforces this view of the statute. This regulation describes the legal structure of the railway's right-of-way under the 1875 Act, and the fee simple title conveyed to the patentee of the land:

> 43 C.F.R. §2842(a) A railroad company to which a right-of-way is granted does not secure a full and complete title to the land on which the right-of-way is located. It obtains only the right to use the land for the purposes of which it is granted and for no other purpose . . . . The Government conveys the **fee simple title in the land over which the right-of-way is granted to the person to whom patent issues** for the legal subdivision on which the right-of-way is located, and such patentee takes the fee subject only to the railroad company's right of use and possession.

43 C.F.R. §2842(a) (1909) (repealed by the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§1701 et seq.) (emphasis added).

Although the government stresses that national policy today favors government ownership of land for environmental and conservation purposes, the property rights of these

early landowners are governed by the law in effect at the time they acquired their land. See Leo Sheep Co. v. United States, 440 U.S. 668, 687-88 (1979) ("This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation.") (footnote omitted); Hastings v. Whitney, 132 U.S. 357 (1889) ("The doctrine first announced in Wilcox v. Jackson, 13 Pet. 498, that a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it, although no exception be made of it, has been reaffirmed and applied by this court in such a great number and variety of cases that it may now be regarded as one of the fundamental principles underlying the land system of this country.").

Both sides say that their positions are supported by statutes enacted in 1906 and 1909 to deal with discontinued rights-of-way, when some of the underlying lands had remained public lands and some had been patented to private persons. Thus 43 U.S.C. §940 stated that the discontinued railway easement is "forfeited to the United States" and that when the burdened land had been "heretofore conveyed by the United States," the forfeiture inures to the benefit of such landowner without further formality. The statute provided that an abandoned right-of-way

> shall be, and hereby is, declared forfeited to the United States . . . and the United States hereby resumes the full title to the lands covered thereby freed and discharged from such easement, and the forfeiture hereby declared shall, without need of further assurance or conveyance, inure to the benefit of any owner or owners of land heretofore conveyed by the United States subject to any such grant of right of way or station grounds . . . .

35 U.S.C. §940. The government argues that this statute established that the United States necessarily retained title to all land subject to a railway easement, for the statute declared the right-of-way "forfeited to the United States." However, the statute well recognized that such land may have been previously conveyed to private owners. Indeed, even on the government's strained construction of §940, the forfeited easement automatically inured to the benefit of the owner of the underlying land "without need of further assurance or conveyance." Even on the government's construction, this 1909 enactment cannot be viewed as overruling the 1875 Act by implication, thereby disrupting thousands of land grants and long-vested property rights.

The Court has consistently preserved the integrity of the land grant patent, in its review and application of the statutes before and after the 1875 Act. Throughout its resolution of various disputes, the Court has required that unless a property interest was expressly reserved by the government, whether in the patent grant or by statute or regulation then in effect, the disposition of the land was in fee simple. For example, in Watt v. Western Nuclear, Inc., 462 U.S. 36, 49 n.9 (1983) the Court applied this rule to mineral rights and noted that:

> If land was erroneously classified as non-mineral and conveyed under a land-grant statute, the patentee received title to the entire land, including any subsequently discovered minerals. Absent proof of fraud, the Government had no recourse once title passed. [Citations omitted.]

In Leo Sheep Co. the Court construed a homestead grant in light of a 1862 railway statute, and held that rights would not be reserved to the government by "divining some 'implicit' congressional intent." The Court stated:

> The Government does not claim that there is any express reservation of an easement in the Union Pacific Act that would authorize the construction of a

public road on the Leo Sheep Co.'s property. Section 3 of the 1862 Act sets out a few specific reservations to the "checkerboard" grant. The grant was not to include land "sold, reserved, or otherwise disposed of by the United States," such as land to which there were homestead claims. Mineral lands were also excepted from the operation of the Act. Given the existence of such explicit exceptions, this Court has in the past refused to add to this list by divining some "implicit" congressional intent. [Citations omitted.]

440 U.S. at 678-79.

The Court's precedent has consistently held that absent an explicit reservation of an interest in land, such would not be implied. See, e.g., Swendig v. Washington Water Power Co., 265 U.S. 322, 329, 331 (1924) ("Appellants contend, and it is true as a general rule, that when, conformably to the laws, entry is made and certificate given, the land covered ceased to be a part of the public lands (Witherspoon v. Duncan, 4 Wall. 210, 219, 18 L. Ed. 339), and that, when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States," subject to express provisions of regulations then in effect.) (citations omitted); United States v. Schurz, 102 U.S. 378, 397 (1880) ("We are of opinion that when, upon the decision of the proper office that the citizen has become entitled to a patent for a portion of the public lands, such a patent made out in that office is signed by the President, sealed with the seal of the General Land-Office, countersigned by the recorder of the land-office, and duly recorded in the record-book kept for that purpose, it becomes a solemn public act of the government of the United States, and needs no further delivery or other authentication to make it perfect and valid. In such case the title to the land conveyed passes by matter of record to the grantee, and the delivery which is required when a deed is made by a private individual is not necessary to give effect to the granting clause of the instrument.").

The nature of the transfer of a right-of-way to a railroad under the 1875 Act, and the patenting to settlers of the land subject to the right-of-way, has been extensively explored.  In Great Northern, 315 U.S. at 271, the Court observed that Section 4 of the 1875 Act, which provided that when the underlying lands were disposed of by the United States they would remain subject to the right-of-way, was not consistent with the railroad's theory that it owned the mineral rights underlying the right-of-way.  The Court cited the congressional explanation of the 1906 statute that: "'Under the present law whenever the railroad passes through a tract of public land the entire tract is patented to the settler or entryman, subject only to this easement.'  H. Rep. No. 4477, 59th Cong., 1st Sess. p.2 (Ser. No.  4908)."  315 U.S. at 277.

The text of the 1875 Act, and the omission of any reservation or retention or reversion of the fee by the United States, negate the now-asserted intention on the part of the United States to retain ownership of the lands underlying railway easements when the public lands were disposed of.  We have been directed to no suggestion, in any land patent, deed, statute, regulation, or legislative history, that can reasonably be construed to mean that the United States silently retained the fee to the land traversed by the right-of-way, when the United States granted that land to homesteaders.

The district court relied on certain legislation of 1920 and 1922 as supporting its theory that the government retained the fee to the land underlying the easement, after granting the land patent without reservation of the fee.  This legislation does not carry the weight attributed to it by the district court.  A 1920 statute, 43 U.S.C. §913, provided: "All railroad companies to which grants for rights of way through the public lands have been made by Congress, or their successors in interest or assigns, are authorized to convey to any State, county, or municipality any portion of such right of way to be used as a public highway or

street:  *Provided,* That no such conveyance shall have the effect to diminish the right of way of such railroad company to a less width than 50 feet on each side of the center of the main track of the railroad as now established and maintained."  The government argues that this shows that Congress viewed the railway right-of-way as under its continuing governmental control and not under private control.  The district court so concluded, stating that "[t]his statute did not, however, authorize the government to convey any portion of its reversionary interest in 1875 Act rights-of-way to the owners of lands abutting or traversed by such rights-of-way," and deemed this omission to support the government's argument that it retained the reversionary interest in all grants of rights-of-way under the 1875 Act, whether or not the underlying land had been included in a subsequent Homestead patent to the land.  However, an authorization to railroads to share their 200-foot wide right-of-way with local highway needs does not mandate the conclusion that the United States retained the fee to the land underlying the right-of-way after land patents including that land were granted to private persons.

To similar effect is the Railroad Rights-of-Way Abandonment Act of 1922, codified at 43 U.S.C. §912.  Section 912 was of the nature of a "quiet title" enactment, for it provided that when a railroad ceased use and occupancy of a right-of-way that was originally granted from the public lands, the disposition of that relinquished right-of-way depended on whether title had previously been granted to a private owner.  Section 912 provided that the interests of the United States would be disposed of in accordance with that premise, in that

> all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment, be transferred to and vested in any person . . . to whom or to which title of the United States may have been or may be granted, conveying

or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid . . . .

43 U.S.C. §912.

The government argues that this supports the position that the government tacitly intended to retain ownership of the servient estate whenever land patents were granted to lands traversed by a previously granted railway right-of-way. The statute does not support this position. The statute requires the United States to convey any rights it may have, to the patentee of the land traversed by the abandoned right-of-way; it does not say what rights the United States had after the land patent was granted. Indeed, if the United States did have residual rights despite the patented land grant, then the statute required that the rights be conveyed to the private owner. Such an interpretation does not weaken the position of the landowners herein. Neither section 912 nor 913 purported to establish governmental ownership of land that had been granted to homesteaders subject to a right-of-way easement.

The record shows no documents retaining a fee interest by the United States when granting any of the land patents here involved. The rights acquired by the homestead patentee are governed by the Act of 1875, which granted to the railroad the right to traverse the land and build stations and other railway structures, and provided that disposition of the land would be subject to the right-of-way. The district court erred in holding that the United States retained the reversionary interest to the land underlying these rights-of-way after disposing of the land by land grant patent under the Homestead Act.

We conclude that the land of Category 1 is owned in fee by the landowners, subject to the railway easement. The district court's contrary decision is reversed. On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use, in accordance with the principles set forth in the Preseault cases. On remand the district court shall determine just compensation on the conditions that apply to these landowners.

### Categories 2 and 3

The landowners in the remaining categories all received their land patents before the Railroad acquired the right-of-way across their lands.

The Category 2 and 3 landowners gave deeds to the Railroad that explicitly granted only a right-of-way restricted to railroad use, and containing a reverter clause to the landowner should the railroad discontinue operation. The district court found that although in the court's view the deeds had conveyed a fee simple interest to the Railroad, the reverter clause restored that interest to the grantor upon abandonment of railroad use. This ruling is not appealed; the district court did not reach the issue of compensation, in view of its Rule 54(b) certification of the other issues.

### Category 4

The Category 4 deeds conveyed to the Railroad "all estate, right, title, and interest" in the right-of-way, including reversionary and remainder interests. The landowners in this category stipulated that the deeds conveyed a fee simple to the Railroad, and that they would not appeal the district court's decision. Based on this stipulation the district court declined to

03-1395                                    16

include Category 4 in the entry of judgment and the Rule 54(b) certification. No appeal is taken as to Category 4. (Categories 7 and 9 are also not appealed.)

### Categories 5, 6, 8, and 15

By warranty deed or quitclaim deed, these landowners conveyed "real estate" that was described as a "right of way" or as a "perpetual right of way" in the substantive part of the deed. The terms of conveyance of the right-of-way are those usually used to convey a fee simple, but in all cases they are explicit to the grant of a right-of-way, and do not specifically mention the underlying land. Neither do the deeds use words of easement, or reverter if railway use is terminated. The district court viewed the words of grant, and the absence of language of easement and reversion as evidence of the intention of the parties -- landowners and Railroad -- to transfer the fee and not an easement.

A deed of Category 5, cited by the district court, grants a "perpetual right of way" extending fifty feet to each side of the center railway line "and the reversion and reversions, remainder and remainders, rents, issues and profits therefrom, and all estate, right, title and interest in and to the said property, as well in law as in equity . . . to have and to hold . . . upon [Pacific & Idaho] and its successors and assigns forever." Another deed of Category 5 is in terms that "grant, bargain, sell, convey and confirm unto [Pacific & Idaho] and to its successors and assigns forever . . . a right of way one hundred feet in width." Another deed is for "a strip of land for a right of way . . . to be used . . . for a right of way . . . and for all and every purpose necessary [in connection with] said railway."

The district court held that the Railroad acquired the underlying land in fee simple. The court reasoned that when "the term 'right-of-way' is used in the descriptive clause to

identify and describe land or 'real estate' granted in the granting clause, the use is treated as merely descriptive of the land granted and not as limiting the grantee railroad's use of the property." Hash, Memorandum Decision at 13-14. The appellants argue that the usage "right-of-way" in the conveyance portion of the deed limits the transfer to a right-of-way, and that since a right-of-way is an easement, when the right-of-way became abandoned the land became unburdened. They point out that railroad rights-of-way were generally granted in perpetuity, because of the permanence of their structures, but that they remained as easements. See generally New Mexico v. United States Trust Co., 172 U.S. 171, 183 (1898). See also Western Union Telegraph Co. v. Pennsylvania R. Co., 195 U.S. 540, 570 (1904) (despite its added strengths, a railway right-of-way does not have "the substantiality of the fee.") The appellants argue that the more reasonable interpretation of the deed language was to grant an easement for railway use, for the foreseen permanence of that use, but not to make a permanent transfer for all other purposes of a narrow corridor traversing the owner's land.

The district court recognized that deeds are interpreted to give effect to the intention of the parties, citing Bumgarner v. Bumgarner, 862 P.2d 321, 329 (Idaho Ct. App. 1993), and that such intent, in the absence of ambiguity in the deed, must be ascertained from the plain wording of the deed itself. City of Kellogg v. Mission Mountain Interests Ltd., 16 P.3d 915, 919 (Idaho 2000). The court saw no ambiguities in these deeds, and held that they transferred a fee simple to the Railroad.

The appellants state that the law of Idaho was clarified after the district court's decision, and that the Idaho Supreme Court's decision in Neider v. Shaw, 65 P.3d 525 (Idaho 2003), is directly relevant and compels reversal as to all or most of the Category 5, 6, 8, and

15 deeds. The Idaho Court held that when the term "right-of-way" appears in the substantive portion of a conveyance instrument, the correct interpretation is that the deed conveyed only an easement and that the underlying land was not conveyed unless explicitly granted in the instrument. The government disputes the position that <u>Neider</u> compels a blanket decision in favor of the landowners, and urges us to remand if we are persuaded that the law in Idaho may have changed, or to certify the question to the Idaho Supreme Court.

We conclude that <u>Neider</u> indeed modified or clarified the law of Idaho, as the Idaho Supreme Court itself recognized, as it distinguished its earlier decision in <u>C & G, Inc. v. Rule</u>, 135 Idaho 763, 25 P.3d 76 (2001), a decision on which the district court relied. The district court had found that the use of "right-of-way" in these deeds could have been used either to limit the legal estate conveyed, or simply to describe the land included in the deed; the district court resolved the perceived ambiguity of intent by holding that the language conveying "all right, title, and interest" was less ambiguous than the usage of "right-of-way," and concluded that these deeds conveyed the fee to the land underlying the right-of-way. However, the Idaho court in <u>Neider</u> placed controlling weight on the usage "right-of-way" in the grant clause.

The deed at issue in <u>Neider</u> contained the traditional "grant, bargain, and sell" terms of a fee conveyance, accompanied by the provision that:

> Provided: nevertheless that this deed is made for right of way, station, sidetrack and warehouse purposes. Should [the Railroad] fail to establish and maintain station and sidetrack, this deed shall be null and void and said land shall revert back to the said J. Fremont Bow and C.A. Bow, his wife, or their legal heirs.

65 P.3d at 527. In holding that this deed conveyed only an easement, the Idaho court compared it with the <u>C & G</u> case where it had reached the opposite conclusion:

> This Court recently ruled on the issue of whether a conveyance instrument granted a fee simple or easement to a railroad in C & G, Inc. v. Rule, 135 Idaho 763, 25 P.3d 76 (2001). In C & G, this Court held that the conveyance instrument unambiguously conveyed a fee simple, not an easement, because, while the instrument was entitled Right of Way Deed, none of the substantive provisions referred to a right-of-way. Id. at 767, 25 P.3d at 80. The conveyance instrument in C & G did not limit the use of the land to "railroad purposes" and it lacked any language indicating a reversionary interest in the grantors. Id. This Court, however, recognized that use of the term right-of-way in the substantive portions of a conveyance instrument creates an easement. Id.

65 P.3d at 530. Thus the Idaho court now teaches that the use of "right-of-way" in the substantive part of the deed creates an easement, not a transfer in fee. Appellants argue that all of the deeds in Categories 5, 6, and 8 use "right-of-way" in substantive portions of the conveyance, and that they are therefore distinguished from the C & G case on which the district court relied.

The Neider court further counseled that "When construing an instrument that conveys an interest in land, courts seek to give effect to the intent of the parties to the transaction. The intent of the parties is determined by viewing the conveyance instrument as a whole." 65 P.3d at 530 (citations omitted). The district court herein applied this salutary rule, but applied the guidance of C & G; this guidance is now modified by Neider in a way that appears to be highly relevant to the deeds here at issue. We therefore vacate the court's decision with respect to Categories 5, 6, 8, and 15, and remand for reconsideration in light of the weight that the Neider court has placed on the use of "right-of-way" in the substantive grant and there is no explicit conveyance of the underlying land.

***Categories 10, 12, and 13***

03-1395                                    20

Categories 10, 12, and 13 (there is no Category 11) relate to land for which no document of transfer from the homesteader to the railway could be found, but where the homesteader preceded the railway on the land. For these lands the district court, upon ascertaining that under Idaho law a fee interest can be acquired by adverse possession, did not view these parcels as distinguished from others in which there was no explicitly reserved right of reversion. The court held that the Railroad owned the land underlying the easement in fee simple.

Appellants complain that the district court engaged in no analysis of the rights of the parties under the Idaho law of adverse possession. The government states that such analysis was not needed because the parties had stipulated that these parcels had been acquired by adverse possession, and that Idaho law provides that adverse possession results in a fee in the adverse possessor. Appellants protest, stating that they had merely accepted "adverse possession" as a label for use in classifying these parcels into categories for this litigation, and not as a stipulation of the result.

The parties had agreed that "these parcels should be treated, for the purposes of this litigation, as having been acquired by the railroad by adverse possession." Thus the owners listed the parcels of Category 10 under the heading "No record B adverse possession." This classification expedient cannot fairly be construed as a stipulation that both the underlying fee and the overlying easement belonged to the railroad; it was not a concession that the requirements of adverse possession had been met. We agree with the appellants that they did not stipulate away the results of this litigation simply by naming Categories 10, 12, and 13 as undocumented and therefore subject to the law of adverse possession.

Idaho Code §5-210 states that, to acquire land by adverse possession, the land must for a period of five years have been either "protected by a substantial enclosure" or "usually cultivated or improved," and that the party claiming by adverse possession must have "paid all taxes, territory, county, or municipal, which have been levied and assessed upon such land according to law." Appellants argue that the government introduced no evidence that the Railroad complied with these requirements, and that the burden of proving adverse possession is on the claimant. The government counters that a railroad is certainly an "improvement," and that it is reasonable to assume that this Railroad paid taxes that included the land over which it had established its right-of-way. This argument was unsupported by any evidence, and cannot, by attorney suggestion, establish the material facts of adverse possession. No evidence as to the payment of taxes was presented on behalf of asserted adverse possessor; this essential requirement cannot be presumed.

Nor does the law of adverse possession require that the property owner be deprived of greater rights than those that are used by the adverse possessor, that is, the railway right-of-way. The appellants argue that the adverse possessor may have acquired a "prescriptive easement," but that title in fee is not thereby acquired. There does not appear to be Idaho precedent on this issue, but the great weight of cases in other jurisdictions is to the effect that adverse occupancy of a right-of-way does not confer on the railway any greater interest in the land than that of a right-of-way easement. See, e.g., Strother v. Bootheel Rail Properties, Inc., 66 S.W.3d 751 754 (Mo. Ct. App. 2001) ("[T]he weight of authority appears to hold that 'a railroad company acquires by prescription or adverse possession only an easement in a right of way.'") (quoting Pollnow v. State Dept. of Natural Resources, 276 N.W.2d 738, 742 (Wis. 1979)); Wheeling Stamping Co. v. Warwood Land Co., 412 S.E.2d 253, 255 (W. Va.

1991); <u>Maryland & P.R. Co. v. Mercantile-Safe Deposit & Trust Co.</u>, 166 A.2d 247, 249 (Md. 1960).  As the Maryland court explained:

> The principal reason advanced in support of the rule is that the nature of the use by the railroad requires no more than an easement in the right of way and does not, therefore, amount to an occupancy adverse to the claim of another to the fee.

166 A.2d at 249.

This authority is consistent with "the long established rule" in Idaho "that any right gained by prescription is confined to the right as exercised during the prescriptive period.  'It is limited by the purpose for which it is acquired and the use to which it is put.'" <u>Idaho Forest Indus., Inc. v. Hayden Lake Watershed Improvement Dist.</u>, 733 P.2d 733, 736 (Idaho 1987) (citation omitted).  As the Idaho Supreme Court explained in <u>Gibbens v. Weisshaupt</u>, 570 P.2d 870, 875 (Idaho 1977), "[p]rescription acts as a penalty against a landowner and thus the rights obtained by prescription should be closely scrutinized and limited by the courts."

The burden of establishing compliance with the law of adverse possession as applied to the fee to the underlying land, as well as for the right-of-way traversing the land, was on the claimant to such possession.  That burden has not been met by "clear and satisfactory evidence."  <u>Utter v. Gibbins</u>, 48 P.3d 1250, 1254 (Idaho 2002) (requiring clear and satisfactory evidence of "all the essential elements for [a] claim of adverse possession under I.C. § 5-210").  The judgment that the railroad acquired fee title to the underlying lands in Categories 10, 12, and 13 is reversed.

***Category 14***

Category 14 is for deeds to the Railroad from the landowner that were executed after the Railroad had entered and occupied the right-of-way, although the landowner possessed

the land patent before the Railroad entered the land.  The appellants argue that when the Railroad entered their land before acquiring a right to do so, this was a de facto condemnation, and cannot give the Railroad more than an easement, whatever the words of the later-executed deed.  They argue that the deed should be interpreted as mere confirmation of the easement already taken by the Railroad, not as conveying additional rights that are unnecessary to the right-of-way and unnecessary to the Railroad's operations.  The appellants argue that this court's opinion in Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996) supports the position that only an easement was obtained, and that the Railroad had no "possessory interest" in the land.  In Preseault the railroad had initially simply occupied the land, and later was granted a "warranty deed" in the terms used for fee transfer; yet this court, applying Vermont law, held that in view of the unauthorized origin of the railroad's entry upon the Preseault's land, the railroad acquired no more than what it needed - an easement for the right-of-way.  Id. at 1535-37.

The district court declined to treat these deeds differently based on the atmosphere of compulsion that the appellants postulated, by analogy to condemnation or forced sale.  We agree with that position, for there was no evidence of any greater inequality between the buyer and seller than for the other deeds.  However, it is appropriate for the court to review these deeds along with those of Categories 5, 6, and 8, in light of the refinement in Idaho law brought about by the Neider decision.  Accordingly, the decision as the deeds of Category 14 is vacated, and remanded to the district court for further review.

**The Policy Argument**

Statute and jurisprudence over the century and a half of railroad development and homesteading reflect the nation's shifts in both land policy and rail dependency. The government stresses that the present national policy is in marked contrast to earlier homesteading policy, and that the earlier movement of federal lands into private ownership is now countered by a policy whereby government title serves national interests such as conservation and public recreation. The appellants respond that the nation, and the courts, must respect these landowners' property rights, whatever the shifts in public attitudes or national policy. We agree that the judicial obligation is to apply the law, to construe the property interests here at issue in accordance with the law in effect at the time the various arrangements were entered into, in implementation of the parties' intent, guided by the decisions of the Supreme Courts of the United States and of Idaho.

### *Conclusion*

Applying the principles we have discussed, the district court's determination as to Categories 1, and 10 (subsuming 12 and 13) is reversed. The determination as to Categories 5, 6, 8, and 14-15 is vacated, and remanded for redetermination in light of the Idaho decision of Neider v. Shaw. The other categories are not presented for review.


<u>REVERSED IN PART, VACATED IN PART, AND REMANDED</u>