HANSARD MINING, INC., a Montana
corporation; and DONALD HANSARD,
an individual,
Plaintiffs and Appellees,

v.

BARRY A. McLEAN, an individual; ESTATE
OF GLEN HAROLD McLEAN; MONTANA
DEPARTMENT OF REVENUE, an agency of
the State of Montana; MADISON COUNTY,
MONTANA, a municipality of the State of
Montana; JOHN DOES 1-100, inclusive; and
all other persons, unknown, claiming or who
might claim any right, title, estate or
interest in, or lien or encumbrance upon, the
real property described in the complaint,
adverse to Plaintiffs' ownership or any cloud
upon Plaintiffs' title thereto, whether such
claim or possible claim be present or contingent,
Defendants and Appellants.

No. DA 13-0469.
Submitted on Briefs March 12, 2014.
Decided July 29, 2014.
2014 MT 199.
376 Mont. 48.
335 P.3d 711.

For Appellants Barry A. McLean and Estate of Glen Harold McLean: **Jack H. Morris**, Morris Law Firm, PLLC, Helena.

For Appellees Hansard Mining, Inc., and Donald Hansard: **Donald V. Snavely**, Snavely Law Firm, Missoula.

JUSTICE McKINNON delivered the Opinion of the Court.

¶1 Hansard Mining, Inc., and Donald Hansard (the Hansards) filed this quiet-title action in the Fifth Judicial District Court, Madison County, against Barry A. McLean and the Estate of Glen Harold McLean (the McLeans), the Montana Department of Revenue, and Madison County, Montana. The Hansards sought resolution of a dispute with the McLeans concerning overlapping property rights. The Department of Revenue and Madison County disclaimed any interest in the case and did not participate in the litigation. The Hansards and the McLeans each moved for summary judgment. The District Court granted judgment in favor of the Hansards, and the McLeans now appeal.

¶2 The issue on appeal is whether the District Court erred in determining that the Hansards' mining patents have priority over the McLeans' homestead patent.

**BACKGROUND**

¶3 The parties' competing claims derive from conflicting patents issued by the United States. In 1943, the United States granted 326.60 acres to Arvilla McLean, the McLeans' predecessor in interest. This land is situated in Madison County in Sections 19 and 30 of Township 3 South, Range 1 East, Montana Principal Meridian. Arvilla McLean's patent states that it was issued pursuant to the Homestead Act (Act of May 20, 1862, 12 Stat. 392, 43 U.S.C. §§ 161-284) and acts

supplemental thereto, including the Stock-Raising Homestead Act (SRHA) (Act of Dec. 29, 1916, 39 Stat. 862, 43 U.S.C. §§ 291-302). The Homestead Act permitted a qualified person to enter unappropriated public lands for the purpose of establishing a homestead, with a maximum allowable claim of one-quarter section (160 acres). 43 U.S.C. § 161. Under the SRHA, however, the maximum allowable claim was increased to 640 acres for lands designated by the Secretary of the Interior as "stock-raising lands." 43 U.S.C. § 291. Such lands were defined as those whose surface was chiefly valuable for grazing and raising forage crops and which did not contain merchantable timber, were not susceptible of irrigation from any known source of water supply, and were of such character that 640 acres were reasonably required for the support of a family. 43 U.S.C. § 292. To obtain a patent, the person was required to reside on the land for three years and to make permanent improvements ·upon the land tending to increase the value of the land for stock-raising purposes. 43 U.S.C. § 293; *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 38, 103 S. Ct. 2218, 2220-21 (1983).[1]

¶4   Section 9 of the SRHA provided that "[a]ll entries made and patents issued under the provisions of [this Act] shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same." 43 U.S.C. § 299. This provision, in effect, severed the mineral rights from the surface rights. In accordance with this section, Arvilla McLean's patent contains the following language: "Excepting and reserving, however, to the United States all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same pursuant to the provisions and limitations of the [SRHA]."

¶5   In 1990, the Hansards purchased seven patented mining claims: Golden Treasure, Boaz Lode, Josephine, Mighty Monarch, Mighty Hawk, Jack Pot, and Hi Hi Lode. With one exception noted below, the lands covered by these claims partially overlap the lands conveyed in the 1943 patent to Arvilla McLean—specifically, Government Lots 12,

---

[1] Both the SRHA and the general homestead laws were repealed by the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, 2787, 43 U.S.C. §§ 1701-1782. Existing patents were unaffected by the repeal. *Watt*, 462 U.S. at 38 n. 1, 103 S.Ct. at 2220 n. 1.

13, and 26 in Section 19—as shown here in Diagram I.[2]

**Diagram I**

¶6   The patents for the mining claims were issued pursuant to §§ 2318 to 2352 of the Revised Statutes of the United States, and legislation supplemental thereto. These statutory sections, which concern mineral lands and mining resources, derived from various acts of Congress, primarily the General Mining Act of 1872 (Act of May 10, 1872, 17 Stat. 91, *as amended*, 30 U.S.C. §§ 21-54). The United States issued the patents to the Hansards' predecessors in interest in the following sequence: Boaz Lode, 1878; Hi Hi Lode, 1944; Golden Treasure and Jack Pot, 1950; and Josephine, Mighty Monarch, and Mighty Hawk, 1953.

¶7   The Hansards commenced the instant lawsuit seeking to quiet title to both the surface and the subsurface rights of their mining claims. The McLeans conceded that the Hansards "own all of the mineral rights for all seven of the patented mining claims." They

---

[2] Diagram I is an exhibit contained in the District Court record.

denied, however, that the Hansards "own any of the surface rights of the overlapping lands of six (6) of the seven (7) mining claims."[3] Relying on the SRHA, the McLeans argued that "[w]hen the United States government issued the homestead patent to Arvilla McLean in 1943, it severed or split the estate into 1) property rights to the surface of the land, which were conveyed to Arvilla McLean; and 2) the subsurface mineral rights, which were reserved and held as property of the United States." The McLeans reasoned that the United States subsequently conveyed to the Hansards' predecessors only the subsurface mineral rights.

¶8 The District Court held a hearing on the motions for summary judgment. During the hearing, the parties agreed that there were no genuine issues of material fact and that the dispute could be resolved as a matter of law. Additionally, the McLeans indicated that they no longer were contesting the Boaz Lode mining claim because this claim had been patented in 1878, long before the homestead patent was issued to Arvilla McLean. Thus, the McLeans maintained a challenge to five of the seven mining claims: Josephine, Mighty Monarch, Mighty Hawk, Jack Pot, and Hi Hi Lode.

¶9 The District Court entered an order granting summary judgment to the Hansards. The court agreed with their argument that, although the patents for Josephine, Mighty Monarch, Mighty Hawk, Jack Pot, and Hi Hi Lode were issued *after* Arvilla McLean's 1943 homestead patent, each mining patent "relates back" to a date, *before* 1943, when the mining claim was first located. Hence, the District Court concluded that the Hansards owned both the surface and the subsurface rights. The court rejected the McLeans' reliance on the SRHA, noting that the SRHA reserved mineral rights in patents issued for stock-raising homesteads, but did not reserve surface rights in patents issued for mining.

## STANDARD OF REVIEW

¶10 We review a district court's ruling on a motion for summary judgment de novo, applying the criteria set forth in M. R. Civ. P. 56. *Yorlum Props., Ltd. v. Lincoln Cnty.* , 2013 MT 298, ¶ 12, 372 Mont. 159, 311 P.3d 748. "The judgment sought should be rendered if the

---

[3] The McLeans admitted in their discovery answers that the Hansards own "the surface rights for the lands covered by the Golden Treasure mining claim." As reflected in Diagram I, the Golden Treasure claim does not overlap Government Lots 12, 13, or 26.

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. If this burden is met, the burden shifts to the nonmoving party. To avoid summary judgment, the nonmoving party must establish with substantial evidence, as opposed to mere denial, speculation, or conclusory assertions, that a genuine issue of material fact exists or that the moving party is not entitled to prevail under the applicable law. *Semenza v. Kniss*, 2008 MT 238, ¶ 18, 344 Mont. 427, 189 P.3d 1188.

¶11 In the present case, the facts are not disputed. The question is whether the Hansards, or the McLeans, are entitled to judgment as a matter of law.

## DISCUSSION

¶12 *Whether the District Court erred in determining that the Hansards' mining patents have priority over the McLeans' homestead patent.*

¶13 The McLeans maintain that the lands at issue consisted of surface property rights, which were conveyed to Arvilla McLean in 1943, and subsurface mineral rights, which were reserved by the United States and subsequently conveyed to the Hansards' predecessors in interest. Based on the premise that "[t]he United States no longer owned the surface rights to the McLean homestead after 1943," the McLeans contend that the United States could not have conveyed those surface rights to the Hansards' predecessors in interest in the 1944, 1950, and 1953 mining patents.

¶14 The McLeans' analysis is contrary to the laws governing patents, and the District Court was correct to reject it. "A patent from the United States operates to transfer the title, not merely from the date of the patent, but from the inception of the equitable right upon which it is based." *U.S. v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 334-35, 26 S. Ct. 282, 286 (1906). This is the "doctrine of relation," which applies where a series of acts or proceedings are necessary to complete a transaction, such as a conveyance or deed. *Gibson v. Chouteau*, 80 U.S. 92, 100-01 (1872); *Eureka Consol. Mining Co. v. Richmond Mining Co.*, 8 F. Cas. 819, 825 (C.C.D. Nev. 1877). "The last proceeding which consummates the conveyance is held for certain purposes to take effect by relation as of the day when the first proceeding was had." *Gibson*, 80 U.S. at 101. Thus, once the preliminary steps have been taken to

acquire title to public lands, the government holds the same in trust for the claimant. *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428, 432-34, 12 S. Ct. 877, 879 (1892); *U.S. v. Bagnell Timber Co.*, 178 F. 795, 798 (C.C.8 1910). "[I]f followed up to patent, [the claimant] is deemed to have acquired the better right as against others to the premises. The patent which is afterwards issued relates back to the date of the initiatory act, and cuts off all intervening claimants." *Shepley v. Cowan*, 91 U.S. 330, 337 (1876). Conversely, if the claimant fails to secure the patent, the government is deemed to have been the owner throughout the period. *Bagnell Timber*, 178 F. at 798. "The consequence of relation back is that the claimant's rights and those of the claimant's [successors in interest] date from the time the claim was made, not from the time the patent was issued." *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1320 (10th Cir. 1997) (citing *Reed v. Munn*, 148 F. 737, 757 (C.C. 8 1906)).

¶15 Accordingly, the questions we must first determine are: what constituted the initiatory acts in securing the Hansards' mining patents and the McLeans' homestead patent, and when did those acts occur. As noted, the Hansards' patents were issued pursuant to various mining laws, primarily the General Mining Act of 1872. As we explained in *Our Lady of the Rockies, Inc. v. Peterson*, 2008 MT 110, ¶¶ 3-4, 342 Mont. 393, 181 P.3d 631, this Act permits a citizen to enter federal lands to explore for valuable mineral deposits. If a deposit is discovered, a mining claim may be filed as to the land where the minerals were found. This involves "locating" the claim. "A location is the act of appropriating such parcel, according to certain established rules. It usually consists in placing on the ground, in a conspicuous position, a notice setting forth the name of the locator, the fact that it is thus taken or located, with the requisite description of the extent and boundaries of the parcel ... ." *St. Louis Smelting & Ref. Co. v. Kemp*, 104 U.S. 636, 649 (1882). The locator gains a possessory interest in the grounds within the boundaries of his location, while the United States retains legal title to the land. Possessory interest can be held indefinitely, provided the annual assessment work is performed, all necessary filings and fee payments are made, and the valuable mineral deposit continues to exist. The locator may secure fee title to the land by applying for a patent. *Our Lady of the Rockies*, ¶¶ 3-4; *U.S. v. Shumway*, 199 F.3d 1093, 1099 (9th Cir. 1999). Upon issuance of the patent, legal title passes to the patent holder, and the title relates back to the date the claim was located. *Our Lady of the Rockies*, ¶ 4. Hence,

"the location of a mine is the inception of a title, and ... the patent, when issued, relates back to the location, and conveys to the patentee all the interest that the government had at the time of the location." *Murray v. City of Butte*, 7 Mont. 61, 67-68, 14 P. 656, 657 (1887); *see also Talbott v. King*, 6 Mont. 76, 106-07, 9 P. 434, 441 (1886); *Silver Bow Mining & Milling Co. v. Clark*, 5 Mont. 378, 422-23, 5 P. 570, 580-81 (1885).

¶16 The Hansards have provided a chronology of the events leading up to the issuance of their patents. The McLeans have not disputed the chronology's accuracy. It reflects that the mining claims were located in the following years: Boaz Lode, 1866; Golden Treasure, 1892; Josephine, 1895; Hi Hi Lode, 1917; Mighty Monarch, 1932; Mighty Hawk, 1932; and Jack Pot, 1934. The Hansards' rights date from these years, not the years in which the patents were issued. *James Barlow Fam.*, 132 F.3d at 1320.

¶17 As for the McLeans' homestead patent, the Homestead Act permitted a qualified person to enter unappropriated public lands for the purpose of establishing a homestead. Entry was effected by making an application at the proper land office, paying the statutory fee, and filing an affidavit declaring that the person's entry was made for the purpose of actual settlement and cultivation. The person could obtain a patent to the land upon proof that he had settled, resided on, and cultivated the land continuously for the requisite number of years after filing the affidavit. *See* R.S. §§ 2289-2291 (43 U.S.C. §§ 161, 162, 164); *Great N. Ry. Co. v. Reed*, 270 U.S. 539, 545-46, 46 S. Ct. 380, 382-83 (1926); *U.S. v. Mills*, 190 F. 513, 516-21 (C.C.5 1911). "The homestead entry vested no title in the [homesteader], but it gave to him, under the law, a right of possession which he might perfect by continued occupancy and improvement." *Flint & Pere Marquette Ry. Co. v. Gordon*, 2 N.W. 648, 655 (Mich. 1879). If he failed to perfect it, what right he had reverted to the United States. If he perfected it, he was entitled to a patent vesting in him the complete legal title, and this title related back to the date of the initiatory act—specifically, the date when his entry was made—so as to cut off intervening claimants. *Knapp v. Alexander-Edgar Lumber Co.*, 237 U.S. 162, 167, 170, 35 S. Ct. 515, 516, 518 (1915); *Flint & Pere Marquette*, 2 N.W. at 655; *see also Peyton v. Desmond*, 129 F. 1, 11-13 (C.C. 8 1904); *Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 2011 MT 263, ¶ 39 n. 13, 362 Mont. 273, 264 P.3d 1065.

¶18 The relevant date for analyzing the McLeans' property rights, therefore, is the date of Arvilla McLean's homestead entry. The

McLeans, however, have failed to identify or provide any evidence of the date when Arvilla McLean made her homestead entry. In their Supplemental Answers to Plaintiff Hansard Mining's First Discovery Requests, the McLeans assert that "Arvilla McLean and her predecessors in interest homesteaded the surface of parts of the [five disputed mining claims] going back at least 80 years ... ." Such conclusory assertions, however, are insufficient to meet the McLeans' burden on summary judgment. *Semenza*, ¶ 18.

¶19  The most that can be inferred on the record before us is that Arvilla McLean made her homestead entry by 1940, given that three years' residence on the land was required in order to obtain a patent under the homestead laws at that time.[4] *Watt*, 462 U.S. at 38, 103 S. Ct. at 2220 (citing 43 U.S.C. §§ 164, 293). All of the Hansards' mining claims were located before 1940. The latest was the Jack Pot claim, which was located in 1934. Therefore, based on the evidence presented by the parties, the Hansards' mining patents have priority over the McLeans' homestead patent.

¶20  A mining patent "carries with it the title to the surface included within the lines of the mining location, as well as to the land beneath the surface." *Deffeback v. Hawke*, 115 U.S. 392, 406, 6 S. Ct. 95, 101 (1885); *accord Gillmor v. Blue Ledge Corp.*, 2009 UT App 230, ¶¶ 17-18, 217 P.3d 723 (reviewing federal precedents and concluding

---

[4] The SRHA, under which Arvilla McLean made her homestead entry, was "effectively suspended" in 1934. *Watt*, 462 U.S. at 38 n. 1, 103 S. Ct. at 2220 n. 1. Pursuant to the Taylor Grazing Act (Act of June 28, 1934, 48 Stat. 1269, 43 U.S.C. §§ 315-315r), President Roosevelt issued Executive Order No. 6910 on November 26, 1934, ordering that "all of the vacant, unreserved, and unappropriated public land" in certain states, including Montana, is "temporarily withdrawn from settlement, location, sale or entry ... pending determination [by the Secretary of the Interior] of the most useful purpose to which such land may be put." *See Andrus v. Utah*, 446 U.S. 500, 513-16 & n. 19, 100 S. Ct. 1803, 1810-12 & n. 19 (1980); *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 787 (10th Cir. 2005). As a result, it may be that Arvilla McLean could not have made her entry after November 26, 1934, and that her entry necessarily occurred before that date. *See Kennedy v. U.S.*, 119 F.2d 564 (9th Cir. 1941). On the other hand, it may be that the land was temporarily withdrawn from entry in 1934, but then was classified as appropriate for stock-raising purposes some years later, *see Andrus*, 446 U.S. at 516 & n. 21, 100 S. Ct. at 1811-12 & n. 21; *cf. Bleamaster v. Morton*, 448 F.2d 1289 (9th Cir. 1971), and that Arvilla McLean made her entry upon the land at that time. The parties have not addressed Executive Order No. 6910 in their briefing, however, and the McLeans have failed to produce any evidence bearing on the question of when Arvilla McLean made her entry. *Semenza*, ¶ 18. Thus, our analysis here is limited to the arguments and evidence presented, which indicate that Arvilla McLean made her entry as late as 1940.

that "where a mining patent has issued, the patent-holder is granted both the surface and mineral rights ..."). Accordingly, the Hansards own both the surface and the subsurface rights of their mining claims (at least where those claims overlap with the land granted to Arvilla McLean[5]), and the conflicting portions of the McLeans' patent are void. *Mantle v. Noyes,* 5 Mont. 274, 291, 5 P.. 856, 862 (1885) ("If the government issues a patent for lands that have been previously sold or reserved from sale, the patent is so far void."); *Noyes v. Mantle,* 127 U.S. 348, 354, 8 S. Ct. 1132, 1135 (1888) ("A patent of the government cannot, any more than a deed of an individual, transfer what the grantor does not possess."); *Brown v. Luddy,* 9 P.2d 326, 332 (Cal. Dist. Ct. App. 1932) (holding that the SRHA homesteader's patent could not convey title to the portion of the land that overlapped an earlier located mining claim); *cf. Silver Bow Mining & Milling,* 5 Mont. at 424-26, 5 P. at 581-82.

¶21 The McLeans resist the foregoing analysis and conclusion, arguing two theories in support of their claim that they hold title to the surface rights of the Hansards' patented mining claims. First, they opine that the relation-back principles discussed above do not govern this case because the parties' patents were issued subsequent to the enactment of the Stock-Raising Homestead Act in 1916. The McLeans would have us resolve this case based on the chronology in which the patents were issued, and thus award priority to Arvilla McLean's patent over the subsequently issued mining patents.

¶22 The language of the SRHA does not support this approach. "The [SRHA], the last of the great homestead acts, provided for the settlement of homesteads on ['stock-raising lands']." *Watt,* 462 U.S. at 37-38, 103 S. Ct. at 2220; 43 U.S.C. § 291. An entry under the SRHA was an "entry under the homestead laws." 43 U.S.C. §§ 291, 293. "Any qualified homestead entryman" could make an entry under the SRHA. 43 U.S.C. § 293. Title to SRHA lands could be secured "by compliance with the terms of the homestead laws." 43 U.S.C. § 293. The homestead laws were thus "incorporat[ed] by reference" into the SRHA. *Watt,* 462 U.S. at 38, 103 S. Ct. at 2220. Under those laws, a homestead patent relates back to the date of the homestead entry. *Supra* ¶ 17. Nothing in the SRHA purports to alter this well-established principle, or the equally well-established principle that a mining patent relates back to the date of the location. *Supra* ¶ 15. There consequently is no basis for

---

[5] This case does not address the Hansards' ownership of those portions of their mining claims which may overlap with other neighboring landowners.

concluding that the doctrine of relation is inapplicable to this case. In fact, the doctrine's applicability has been recognized in cases involving the SRHA. *See e.g. Guerra v. Packard*, 46 Cal. Rptr. 25, 37 (Cal. Dist. Ct. App. 1965); *Wilbur v. U.S. ex rel. Stuart*, 53 F.2d 717, 719-20 (D.C. 1931).

¶23 Second, the McLeans point out that the Hansards' mining patents contain language which states: "This patent is issued subject to the provisions of the Act of December 29, 1916 (39 Stat. 862) [i.e., the SRHA], with reference to the disposition, occupancy and use of the land as permitted to an entryman under said Act." The McLeans argue that this language limits the Hansards' ownership to the subsurface mineral rights.

¶24 The SRHA enabled the federal government to transfer the surface of stock-raising lands to the homesteader, while reserving title to the minerals. "Congress' purpose in severing the surface estate from the mineral estate was to encourage the concurrent development of both the surface and subsurface of SRHA lands." *Watt*, 462 U.S. at 50, 103 S. Ct. at 2226. "While Congress expected that homesteaders would use the surface of SRHA lands for stockraising and raising crops, it sought to ensure that valuable subsurface resources would remain subject to disposition by the United States, under the general mining laws or otherwise, to persons interested in exploiting them." *Watt*, 462 U.S. at 47, 103 S. Ct. at 2225.

¶25 Nothing in the SRHA, however, purports to effect this severance of the surface estate from the mineral estate immediately upon the SRHA's passage in 1916, or upon the Secretary of the Interior's designation of particular lands as "stock-raising lands." *See* 43 U.S.C. §§ 291-292. Section 9 of the SRHA indicates that the severance instead occurred upon a homesteader's entry of SRHA lands. 43 U.S.C. § 299. Pursuant to such entry, the homesteader obtained a right of possession in the surface estate, which he might perfect by continued occupancy and improvement. Meanwhile, a person qualified to locate mineral deposits could subsequently enter the same land for the purpose of prospecting, provided he did not injure, damage, or destroy the homesteader's permanent improvements. 43 U.S.C. § 299. If a mineral deposit was located, the prospector could ultimately obtain a patent, but only for the mineral estate. Rights to the surface estate remained with the homesteader. 43 U.S.C. § 299.

¶26 In contrast, *prior to* entry by an SRHA homesteader, the land remained subject to exploration under the general mining laws. 30 U.S.C. § 22. Significantly, if a valuable mineral deposit was found,

the location of that claim represented an appropriation of the land containing the deposit. *St. Louis Smelting & Ref.*, 104 U.S. at 649. The locator had "the exclusive right of possession and enjoyment of all the surface included within the lines of [his] location[ ]." 30 U.S.C. § 26; *see also Watterson v. Cruse,* 176 P. 870, 872 (Cal. 1918) ("While the paramount fee remains in the government until it has issued its patent, yet as to everyone else the estate acquired by a perfected mining location possesses all the attributes of a title in fee ... ." (internal quotation marks omitted)). The grounds within the location were thus segregated from the public domain and ceased to be public land. The area became the locator's property, and laws providing for the sale and purchase of the public domain—such as the SRHA—no longer had any application to it. *St. Louis Mining & Milling Co. v. Mont. Mining Co.,* 171 U.S. 650, 655, 19 S. Ct. 61, 63 (1898); *Bradford v. Morrison,* 212 U.S. 389, 394-95, 29 S. Ct. 349, 350-51 (1909); *Silver Bow Mining & Milling,* 5 Mont. at 415, 5 P. at 576; *Our Lady of the Rockies,* ¶ 3. The patent, when issued, related back to the date of the location and "cut off" all adverse intervening claimants. *Shepley,* 91 U.S. at 337; *Heydenfeldt v. Daney Gold & Silver Mining Co.,* 93 U.S. 634, 641 (1877). The patent was not limited to the mineral estate, but included "title to the surface included within the lines of the mining location, as well as to the land beneath the surface." *Deffeback,* 115 U.S. at 406, 6 S. Ct. at 101; *accord Brown,* 9 P.2d at 331 ("a mining claim gives surface as well as subsurface rights to all lands included within the lines of the location"); *Gillmor,* ¶ 17 (same).

¶27 Thus, the language in the Hansards' mining patents stating that "[t]his patent is issued subject to the provisions of the [SRHA]" simply acknowledges that, to the extent the mining claims were located on land that had *already* been entered by a homesteader under the SRHA, the mining patentee acquired only the mineral estate. 43 U.S.C. § 299. However, there is no evidence in the record establishing that a homestead entry under the SRHA was made on the McLeans' land *prior to* the location of the Hansards' mining claims on a portion of that same land. As such, the grounds within the mining locations were appropriated by the Hansards' predecessors in interest and, at that point, ceased to be public lands. Since the SRHA permitted homestead entries only on "unappropriated, unreserved public lands," 43 U.S.C. § 291, the lands within the mining locations were no longer open to entry by Arvilla McLean. Upon receiving the patents for the mining claims, the Hansards' predecessors acquired title to both the surface and the land beneath the surface of the mining locations.

## CONCLUSION

¶28 The Hansards own the surface and the subsurface rights of their mining claims. The conflicting portions of the McLeans' patent are void. The Hansards are entitled to judgment as a matter of law, and the District Court did not err in granting their motion for summary judgment and in denying the McLeans' cross-motion for summary judgment.

¶29 Affirmed.

JUSTICES COTTER, BAKER, WHEAT and RICE concur.